Lawrence Robert **STINNETT**, Appellant,

v.

**COMMONWEALTH** of Kentucky, Appellee.

No. 2010–SC–000347–MR.

Supreme Court of Kentucky.

Nov. 23, 2011.

---

19. *Strange,* 269 S.W.3d at 852.

V. Gene Lewter, Department of Public Advocacy, Frankfort, KY, for appellant.

Jack Conway, Attorney General, William Bryan Jones, Office of the Attorney General, Frankfort, KY, for appellee.

Opinion of the Court by Justice NOBLE.

Appellant, Lawrence Robert Stinnett, appeals as a matter of right, Ky. Const. § 110, from a judgment of the Warren Circuit Court convicting him of murder and kidnapping. As a result of his convictions, he was sentenced to a single prison term of life without parole.[1]

Appellant raises the following arguments: (1) that the trial court erred by failing to dismiss the kidnapping charge pursuant to KRS 509.050, the kidnapping exemption statute; (2) that the trial court erred by instructing the jury on the crime of intentional murder; (3) that the trial court erred by refusing to remove the two trial attorneys who represented him and assign another attorney or, alternatively, erred by permitting him to represent himself; (4) that the trial court erred by refusing to compel the attendance of an out-of-state witness, a psychologist who had previously examined Appellant; and (5) that the trial court erred by permitting the Commonwealth to use a letter written by his prior attorney to admit hearsay and privileged information into evidence. Finding no error, this Court affirms. On the issue of the kidnapping exemption, the Court affirms the trial court's decision but on different grounds than those stated by the trial court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In early 2006, Appellant lived with his girlfriend, Christina Renshaw, in Bowling Green, Kentucky. His work required him to travel, and in February 2006, he was working in Oklahoma with an assistant, Alanda Lewis. In the early morning hours of February 3, 2006, Appellant called Renshaw. After their conversation ended, the telephone connection remained open for about three hours during which time Appellant overheard what sounded to him like Renshaw having sexual relations with several men.

Upset by what he thought Renshaw was doing, he promptly decided to drive back to Bowling Green. Lewis rode with him. On the way, Appellant left several angry messages on Renshaw's cell phone, most of

---

1. The final judgment contains what appear to be clerical errors. It incorrectly recites the jury's verdict on each crime as "life without the benefit of probation or parole," whereas the jury fixed only the kidnapping sentence at life without probation or parole. It fixed the murder sentence at life imprisonment. In addition, the Judgment imposes only one sentence of "Life without benefit of probation or parole" without indicating for which crime. Since the imposed sentence accurately matches only the kidnapping sentence as fixed by the jury and it exceeds the jury's sentence for the murder conviction, it appears that the trial court sentenced Appellant only for the crime of kidnapping, not for murder. Since we affirm the convictions on both charges, and because dual life sentences must be served concurrently, the error is, at this point, inconsequential.

which degraded her as promiscuous. But, he also made threats of physical violence against her, saying, for example, that he would break her neck, that he would twist her head off her neck, and that she "was finished."

Appellant and Lewis arrived in Bowling Green around dusk on February 3, 2006. Renshaw was not home. Appellant parked the vehicle away from the residence, and he and Lewis entered to await Renshaw's return. While they waited, Appellant destroyed various items in the residence and loaded other items in his vehicle. Appellant told Lewis, "I'm going to kill this bitch."

Renshaw eventually returned to the residence. When she entered, Appellant immediately knocked her down and began beating her and accusing her of having had sexual relations with other men. Appellant beat, stomped, and kicked Renshaw. He held up a knife, and as Renshaw begged for her life, he offered Lewis $500 if she would kill Renshaw. At one point, he had Lewis gag Renshaw with a wash cloth and at another point, forced used cat litter into her mouth. He also interrupted his beating of Renshaw to strangle her with a lamp cord. Lewis participated in the violence against Renshaw, though she maintains she did so only because Appellant had threatened her. The ordeal continued for one and a half hours, until Renshaw was finally beaten to death. The cause of Renshaw's death was determined to be multiple blunt force injuries, the most significant of which was extensive brain damage caused by blows to her head.

Police were alerted to the disturbance and arrived to find Renshaw dead. Appellant and Lewis were still there. Appellant told them, "I'm not going to lie; we were fighting like cats and dogs." Renshaw's blood was found on the refrigerator, the stove, a wall, a lampshade, and on Appellant's boot. As he was being transported to jail following his arrest, Appellant pondered aloud, "Why did I do this? What was I thinking?" During jail telephone conversations, which were recorded, Appellant said, "I snapped ... I put my hands on her ... we beat that bitch down ... I stomped her, but I didn't try to kill her."

Appellant was indicted for murder, kidnapping, and of being a first-degree persistent felony offender.[2] At trial, Appellant represented himself, with the assistance of two DPA[3] attorneys serving as stand-by, or hybrid, counsel. Appellant admitted that he attacked Renshaw but claimed that he committed the crimes while acting under extreme emotional disturbance (EED). He claimed that Lewis delivered the brunt of the beating. At the conclusion of the evidence, Appellant was found guilty of murder and kidnapping. This appeal followed.

## II. THE KIDNAPPING EXEMPTION DOES NOT APPLY

Appellant first argues that the trial court erred by failing to dismiss the kidnapping charge pursuant to the kidnapping exemption statute, KRS 509.050, which in certain circumstances precludes a kidnapping conviction. Prior to trial, Appellant moved to dismiss the kidnapping charge based upon the exemption. He renewed the motion at the conclusion of the trial's guilt phase.

2. The persistent felony offender charge against Appellant was dismissed. Lewis was indicted for murder and kidnapping. Their cases were severed for trial, and Lewis testified against Appellant.

3. Department of Public Advocacy.

The trial court refused to apply the exemption, explaining that while there was evidence from which one could infer that Appellant intended to murder the victim based on his comments before he ever returned to her home, there was also evidence that he intended to detain her to brutalize and demean her, with her death being incidental to the beating. Because there was evidence that the defendant intended to commit both murder and kidnapping, the trial court instructed on both crimes. While the result was correct, the question is not whether there is evidence of more than one crime, but whether the restraint of the victim was that which is ordinarily incident to committing the non-kidnapping crime when restraint is a part of the criminal act charged.

 In some circumstances, the kidnapping exemption statute, KRS 509.050, bars a kidnapping or unlawful imprisonment conviction when the defendant has committed another crime. The exemption statute states in relevant part:

A person may not be convicted of unlawful imprisonment in the first degree, unlawful imprisonment in the second degree, or kidnapping when his criminal purpose is the commission of an offense defined outside this chapter and his interference with the victim's liberty occurs immediately with and incidental to the commission of that offense, unless the interference exceeds that which is ordinarily incident to commission of the offense which is the objective of his criminal purpose.

KRS 509.050. The statute works by merging the offense of kidnapping with an offense other than kidnapping when a defendant interferes with a victim's liberty during the commission of the other offense. However, the interference with the victim's liberty must occur immediately with and be incidental to the other offense.

Even then, the kidnapping exemption will not apply if the restraint exceeds that which is "ordinarily incident to" the non-kidnapping offense.

 The exemption statute is designed to prevent misuse of the kidnapping statute to secure greater punitive sanctions for rape, robbery and other offenses when the crime itself inherently involves restraint done to accomplish the crime (for example, holding a victim to cut his throat). *Gilbert v. Commonwealth,* 637 S.W.2d 632, 635 (Ky.1982); *Moore v. Commonwealth,* 634 S.W.2d 426, 434 (Ky.1982); *Calloway v. Commonwealth,* 550 S.W.2d 501, 503 (Ky.1977). This includes both "offenses ... defined in such a way as to always involve physical restraint," and "[o]ther offenses [that] may involve a restriction of someone's liberty because of the manner in which they are committed." KRS 509.050 Ky. Crime Comm'n/LRC cmt. (1974). Through the exemption, "the drafters [of KRS 509.050] expressed a willingness to alleviate the problem of overzealous prosecution, by tacking on kidnapping charges to certain crimes through a hypertechnical application of the statutory language. The commentary [to KRS 509.050] noted that restriction of another's liberty is often an essential or incidental element to the commission of certain violent crimes." *Hatfield v. Commonwealth,* 250 S.W.3d 590, 599 (Ky.2008) (citation omitted). The trial court, rather than the jury, determines whether the exemption applies, and we review that determination under the abuse of discretion standard. *Duncan v. Commonwealth,* 322 S.W.3d 81, 94 (Ky.2010).

This Court has interpreted KRS 509.050 as requiring a three-prong test to determine when the kidnapping exemption applies:

First, the underlying criminal purpose must be the commission of a crime de-

fined outside of KRS [Chapter] 509. Second, the interference with the victim's liberty must have occurred immediately with or incidental to the commission of the underlying intended crime. Third, the interference with the victim's liberty must not exceed that which is ordinarily incident to the commission of the underlying crime.

*Hatfield,* 250 S.W.3d at 599. All three prongs must be satisfied in order for the exemption to apply. *Id.*

Appellant contends that the exemption should apply to bar the kidnapping charge because the Commonwealth's theory of the case was that his "criminal purpose" upon leaving Oklahoma was to kill Renshaw, murder is a crime defined outside of KRS Chapter 509, and the evidence indicates any detention or unlawful restraint of Renshaw was immediate and merely incidental to the intentional murder.

The trial court's analysis of the kidnapping exemption focuses on intent. As the trial court noted, the evidence of Appellant's violent attack upon Renshaw would support the conclusion that he acted with a criminal purpose of intentionally murdering her. But, as the trial court also noted, other evidence indicated Appellant did not intend to kill Renshaw. Appellant told Renshaw as he tormented her, "I'm taking you with me" and "you're gonna go make me some money," apparently through prostitution. Further, Lewis had told the police that Appellant had cleaned out the back seat of his car so that he could take Renshaw with him. From such evidence one could reasonably conclude that Appellant intended to detain Renshaw as he inflicted bodily injury and terrorized her, which constitutes the crime of kidnapping as defined in KRS 509.040(1)(c) ("A person is guilty of kidnapping when he unlawfully restrains another person and when his intent is: ... to inflict bodily injury or to terrorize the victim or another."). Thus, there was evidence that met the elements of both murder and kidnapping.

But given the alternate inferences that might be drawn from the evidence, Appellant argues that the proof establishing that his "underlying criminal purpose" was to murder his victim negates the conclusion that he acted with the purpose of simply detaining the victim to inflict bodily injury and terrorize her. However, these two crimes are not automatically merged under the kidnapping exemption statute. The fact that another crime was committed does not necessarily entitle a defendant to the exemption. Conversely, that the facts prove all the elements of kidnapping does not prevent application of the exemption; indeed, such an approach would render the exemption statute superfluous.

Instead, a trial court must actually apply the exemption statute to determine whether the restraint that was a part of the other crime—here, an assault resulting in murder—was such that it exceeded the restraint necessary to commit the other crime. To that end, a case-by-case analysis is required depending on the specific facts of a given case. *Gilbert,* 637 S.W.2d at 635 (requiring a case-by-case analysis). Even if the first two prongs of the test are met (having a criminal purpose to commit a non-kidnapping crime, and the restraint is immediately with and incidental to the crime), the exemption will not apply if the restraint goes beyond that integral to commission of the offense.

The first prong of the kidnapping exemption is met. This prong is ordinarily satisfied simply by looking at whether an offense other than kidnapping was committed. *See, e.g., Murphy v. Commonwealth,* 50 S.W.3d 173, 180 (Ky.2001) ("Here, the first prong of the test is satisfied since the underlying offense was first-degree bur-

glary, defined in KRS 511.020."). Here, Appellant had the criminal purpose of murder, which is a crime outside the statute. That a court could also divine a criminal purpose to kidnap by looking at evidence of a defendant's shifting intent does not, by itself, bar application of the exemption.

Turning to the second prong, it is arguable that Appellant did restrain the victim immediately with and incidental to the crime of murder under the facts of this case. Clearly, she was under restraint at the time any final or killing blow may have been delivered, and it was that blow that resulted in death *immediately*. The victim was restrained to effectuate the beating that led to her death from multiple blunt force trauma. The restraint was "close in distance and brief in time," which seems to satisfy the immediately-with-and-incidental-to requirement. *Timmons v. Commonwealth*, 555 S.W.2d 234, 241 (Ky.1977). But the analysis does not end here.

■ The statute requires a third determination before the exemption may apply: whether the restraint the Appellant exercised on the victim throughout the course of her ordeal "exceeds that which is ordinarily incident to commission of the offense which is the objective of his criminal purpose." KRS 509.050. Historically, this has been the most important prong of the exemption test. *See* Robert G. Lawson & William H. Fortune, *Kentucky Criminal Law* Section 10–3(c)(2) (1998) ("The 'hoop' that is determinative in most cases is the requirement that the interference not exceed that which is normally incidental to commission of the underlying offense."); KRS 509.050 Ky. Crime Comm'n/LRC cmt. (1974) ("Before criminal behavior that is directed toward the completion of robbery, rape, or some other offense can constitute kidnapping, there must be an interference with liberty in excess of that

which ordinarily accompanies that offense.").

In this case, the restraint of the victim did exceed that ordinarily incident to the commission of murder. Appellant could have killed her without taking an extended time to terrorize her. While the coroner's report indicated that she died from multiple blunt force injuries, particularly to the head, meaning much of the beating and any attendant restraint contributed to the murder, the Appellant committed other acts that were clearly not fatal or even related to the murder. These include gagging her and strangling her short of death, stuffing dirty cat litter down her throat, verbally demeaning her, and holding her while he bargained with his accomplice to kill her. It is also likely that he inflicted numerous blows that did not contribute to her death, which further extended the restraint used. Each of these actions included a component of restraint and thus contributed to the overall period of captivity which lasted well over an hour. Appellant engaged in substantial detours from his other crime—the ultimately deadly assault—to humiliate and degrade his victim. The restraint on her liberty clearly exceeded what is ordinarily required to commit the offense of murder, even one committed by an extended beating.

This aligns with the view expressed in *Gilbert* that only where restraint is *necessary* to commit the crime, as an integral part of the crime, are kidnapping and imprisonment offenses merged with the other offense actually committed. 637 S.W.2d at 635. As the qualifying language of the statute states, if a defendant exceeds the level of restraint necessary for the other offense, he cannot take advantage of the kidnapping exemption.

This also aligns with the view expressed in the commentary that where a defendant chooses a means of committing the non-

kidnapping crime that includes an element of restraint, that restraint can also merge with the other offense. KRS 509.050 Ky. Crime Comm'n/LRC cmt. (1974). This is important to recognize because murder does not have restraint of liberty as an element, though it may be part of a specific *fact pattern*, as in this case. All that is required to commit murder is that a defendant intentionally or wantonly with extreme indifference to human life cause the death of another. Obviously, murder may involve no restraint at all.

But when murder does involve restraint, as in this case, then the degree of restraint becomes critical because the question of whether the restraint merges with the murder or stands alone is the difference between murder and capital kidnapping. Murder has been read to be a statutory aggravating factor for giving the death penalty for kidnapping. *See Harris v. Commonwealth,* 793 S.W.2d 802, 805 (Ky. 1990) (construing KRS 532.025 and 509.040). Thus, when a kidnapping charge can stand with a murder charge, it can become *capital* kidnapping, and the stakes are obviously much higher than with a charge of murder alone.

In reaching the same conclusion as to the applicability of the exemption, the trial court emphasized that the evidence showed that Appellant had multiple intents. In analyzing application of the exemption, a defendant's actions will define whether the exemption applies, not his intentions. For example, killing someone who is naked in his bath tub by holding his head under water until he drowns includes restraint and murder, and may also include the intent to demean the person or make his death painful. But if the restraint is immediate to the drowning, the kidnapping exemption would apply. In this example, the elements of both kidnapping and murder were met. The defendant restrained the victim in order to terrorize or inflict bodily injury, KRS 509.040 (kidnapping statute), and the defendant intentionally killed the victim, KRS 507.020 (murder statute). But the exemption would apply because of the level, timing, and location of the restraint, which was immediately with and incidental to the crime and did not exceed that ordinarily necessary to commit the crime. In contrast, if the defendant detained the victim and waterboarded him intermittently over several hours, and then killed him, the kidnapping exemption would not apply because the restraint would go beyond what is normally incidental to murder, even one committed by drowning the victim.

Thus the Appellant's actions in this case support both a charge of kidnapping and a charge of murder. That these facts are sufficient to demonstrate an *intent* to restrain the victim in order to terrorize or cause bodily injury to her as well as to kill her is not the reason that the kidnapping conviction stands in this case. Looking at the defendant's intent as to the elements of kidnapping alone, or even primarily, improperly focuses the analysis on whether there was sufficient proof to sustain a kidnapping charge. The intent analysis breaks down when considered with the fact that there are other lesser kidnapping offenses—two degrees of unlawful imprisonment—that do not require proof of intent to terrorize or inflict bodily injury. At the very least, if proof of intent to terrorize or injure is sufficient to bar the kidnapping exemption, then the focus on intent would lead to inconsistent results, since it means that the exemption could apply if the Commonwealth charged a lesser restraint offense but not if it charged kidnapping. But in practice, a focus on the defendant's intent would mean that the exemption could *never* apply to the unlawful imprisonment offenses, which require only a

knowing restraint.[4] This element would necessarily be proven in every case that could withstand a directed verdict motion, meaning that there is evidence of an "intent" to commit a restraint crime along with a crime outside KRS Chapter 509.

Thus, the focus of the exemption analysis is whether the degree of restraint exhibited by Appellant exceeds that which was necessary to commit the murder in this case. That factor prevents the kidnapping exemption from applying here through the facts of this case and the plain language of the statute.

## III. THE INTENTIONAL MURDER INSTRUCTION WAS PROPERLY SUBMITTED

■ Appellant next argues that the trial court erred in instructing the jury on the offense of intentional murder "because the [trial] court gave an instruction on intentional murder when it did not believe [he] intended to kill Christina Renshaw." His rationale for this argument is that upon ruling that the kidnapping exemption did not apply, the trial court implicitly concluded that murder was not Appellant's criminal objective, thus negating the charge of intentional murder. Appellant admits that he did not raise this particular argument for a directed verdict, and that the claim of error is not preserved. Our review, therefore, is pursuant to RCr 10.26.

■ A defendant's entitlement to a directed verdict is evaluated under the test set forth in *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.1991). Under the *Benham* test, in considering a motion for a directed verdict, the trial court is required to draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. "If the evidence is sufficient to induce a reasonable juror to believe beyond reasonable doubt that defendant is guilty, a directed verdict should not be given." *Id.*

In this matter, there is such evidence, and Appellant was not entitled to what would have amounted to a directed verdict on the intentional murder charge. As discussed above, the elements of both murder and kidnapping were met in this case, and the offenses did not merge because Appellant's restraint of the victim went beyond what is ordinarily incident to murder. Specifically, Appellant committed intentional murder by beating the victim to death. He committed kidnapping by gagging and strangling the victim without killing her, stuffing cat litter down her throat, and verbally demeaning her; these actions show that the Appellant unlawfully restrained the victim with the intent to terrorize and inflict bodily injury. KRS 509.040. The two offenses did not merge in this case because the restraint exceeded what is ordinarily incident to murder. The claim that the trial court implicitly found that Appellant did not commit intentional murder is belied by the fact that the court ultimately instructed the jury on that crime.

Appellant was properly charged with both crimes. As such, palpable error did not occur as a result of the trial court's presenting the murder instruction to the jury.

---

4. The two degrees of unlawful imprisonment are differentiated by whether the restraint is "under circumstances which expose that person to a risk of serious physical injury." KRS 509.020(1). Kidnapping, as the still higher offense, requires an additional intent, including an intent to terrorize or cause bodily injury. KRS 509.030(1).

## IV. THE TRIAL COURT PROPERLY DENIED APPELLANT'S REQUEST TO REMOVE HIS ATTORNEYS AND ALLOWED HIM TO REPRESENT HIMSELF

Appellant next argues that the trial court erred by refusing to grant his request to replace the two DPA attorneys who represented him at trial with different attorneys in their place or, in the alternative, that the court erred by allowing Appellant to represent himself when he was not mentally competent to do so. Appellant concedes that his alternative argument is not preserved, but requests palpable error review. RCr 10.26.

At the outset of the proceedings, the Department of Public Advocacy was appointed to represent Appellant because of his indigence. Initially, Eric Clark was appointed to represent Appellant, but he was replaced by Bette Niemi, head of the Capital Trial Unit. She later voluntarily withdrew, and DPA attorneys Vincent Yustas and Jon Hieneman were assigned to the case, with Yustas serving as lead counsel. During the almost three years it took to bring the case to trial, Appellant filed numerous motions and wrote frequent letters to the trial court seeking to have Yustas and Hieneman replaced. Appellant's principal complaint was that his attorneys did not maintain contact with him and, correspondingly, failed to discuss his defense with him. He also claimed that they had failed to investigate his case and interview witnesses. Based upon his dissatisfaction, Appellant twice filed complaints against his attorneys with the Kentucky Bar Association.

The trial court ultimately denied all requests to replace Yustas and Hieneman, and after the trial court granted Appellant's request to represent himself at trial, they participated in the trial as stand-by, or hybrid, counsel.

### A. Failure to Replace Appointed Counsel

We first consider the trial court's denial of Appellant's request to replace Yustas and Hieneman. Where an indigent defendant seeks to change his appointed counsel, he carries the burden of demonstrating to the court that there exists "good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict." *Shegog v. Commonwealth*, 142 S.W.3d 101, 105 (Ky.2004). We have further described good cause as: "(1) a complete breakdown of communications between counsel and defendant; (2) a conflict of interest; and (3) where the legitimate interests of the defendant are being prejudiced." *Deno v. Commonwealth*, 177 S.W.3d 753, 759 (Ky. 2005) (citing *Baker v. Commonwealth*, 574 S.W.2d 325, 326–327 (Ky.App.1978)). Accordingly, the bar is set high for a defendant to force appointed counsel off the case. And while we have recognized that a bar complaint or a lawsuit filed by an indigent defendant against his appointed counsel may give rise to good cause for his replacement, such filings do not warrant an automatic substitution of an assigned public defender. *Grady v. Commonwealth*, 325 S.W.3d 333, 345–346 (Ky.2010). To so hold would allow a dissatisfied client to manufacture "good cause" by simply filing a bar complaint. It follows that mere dissatisfaction with appointed counsel's performance is insufficient to support a motion to support his removal.

In this case, Appellant has proffered little more than generalized dissatisfaction with his appointed counsel. He fails to allege any of the well-established bases to obtain such relief. As such, we find no error in the trial court's denial of his multiple requests to replace appointed counsel.

## B. Appellant's Self–Representation

We next review the trial court's decision to allow Appellant to represent himself. It is well established that a criminal defendant may waive his right to representation by counsel under the Sixth Amendment of the United States Constitution and Section Eleven of the Kentucky Constitution, and to represent himself if he chooses. *Iowa v. Tovar*, 541 U.S. 77, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004); *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). *Faretta* sets forth the protective measures to be taken to assure that a decision for self-representation was knowing, willing, and voluntary.

In response to Appellant's motion to proceed pro se, the trial court held a *Faretta* hearing, where it was established, among other things, that Appellant had been a legal aide in Oklahoma and had represented himself before. The hearing also disclosed that he was not under the influence of drugs, except for the prescription drug Prozac. Further, the record is replete with pro se motions filed by Appellant throughout the proceedings which reflect a level of legal understanding well above the average layperson. Asked by the trial court if he was competent to represent himself, Appellant replied "totally." The trial court thereafter granted his motion.

Despite the trial court's diligent compliance with the requisite *Faretta* procedures, Appellant now claims that the trial court erred by failing to comply with the duties placed upon a court by *Indiana v. Edwards*, 554 U.S. 164, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008), when a defendant with mental problems seeks to represent himself. *Edwards* held that a state may properly require representation by counsel for defendants who are competent enough to stand trial, but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves. *Id.* at 178, 128 S.Ct. 2379. Thus, to the extent that *Edwards* is about whether the state can force counsel upon a mentally ill defendant who seeks to proceed pro se, it is inapplicable, since counsel was not forced on Appellant. Rather, Appellant complains that he was allowed to proceed without counsel while purportedly mentally ill, which is the converse of the facts in *Edwards*. However, as *Edwards* notes, the Supreme Court had previously held in *Godinez v. Moran*, 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993), that there are some limits on allowing a mentally ill defendant to waive his right to counsel. But as *Godinez* notes, those limits are the same as the waiver of any other right. *Id.* at 399–400, 113 S.Ct. 2680 ("Nor do we think that a defendant who waives his right to the assistance of counsel must be more competent than a defendant who does not, since there is no reason to believe that the decision to waive counsel requires an appreciably higher level of mental functioning than the decision to waive other constitutional rights."). In other words, a court need only be assured that the defendant is competent to stand trial and "that the waiver of his constitutional rights is knowing and voluntary." *Id.* at 400, 113 S.Ct. 2680.

Appellant's allegation of error is made against the following background. During the proceedings Appellant's mental status was twice evaluated by Dr. Greg Perri of the Kentucky Correctional Psychiatric Center (KCPC). In his first evaluation, Dr. Perri determined that Appellant was criminally responsible for the crimes (he was not insane at the time), and that he was competent to stand trial. In his second evaluation, Dr. Perri again determined

that Appellant was competent to stand trial.

Appellant failed to show that he had a debilitating mental illness that rendered him incompetent to stand trial or to waive the right to counsel. He asserts that he was "obviously paranoid" because he believed his attorneys were conspiring with the Commonwealth, and that a diagnosis of obsessive compulsive disorder indicated he could not think clearly about the issues confronting him.[5] The trial court conducted a thorough *Faretta* hearing, and properly found that Appellant's decision to waive his right to counsel was knowing and voluntary. This is all that is required by *Godinez*. We can find no abuse of discretion in the trial court's determination that Appellant was competent to represent himself at trial, with stand-by counsel.

Appellant also contends that his decision to represent himself was forced upon him by the trial court's refusal to remove his attorneys. However, we have concluded that the trial court's refusal to dismiss them was proper, and it follows that their continued representation may not be used to support a claim of coerced self-representation. *Sykes v. Commonwealth*, 553 S.W.2d 44, 46 (Ky.1977) ("[I]t was not an abuse of discretion for a trial court to order a trial to proceed although the defendant and his attorney were unhappy with each other.").

In this case, the trial judge had over two years of experience with Appellant and received the results of two different competency evaluations conducted by Dr. Perri, a clinical psychologist. Dr. Perri concluded the Appellant was competent to assist in his own defense. While Dr. Auble, a clinical psychologist, stated he *probably* suffered from mental illness, her evaluation was never completed. As such, her opinion does not hold the same weight as the completed evaluation provided by Dr. Perri. This Court further finds no credence in Appellant's self-diagnosis of raging paranoia because there is no evidence to support it.[6]

In summary, no error, palpable or otherwise, occurred as a result of the trial court's granting of Appellant's request to represent himself at trial.

## V. THE TRIAL COURT PROPERLY DENIED APPELLANT'S REQUEST TO COMPEL DR. AUBLE'S ATTENDANCE AT TRIAL

 Appellant next argues that the trial court erred by denying his request for an out-of-state subpoena for Dr. Pam Auble, a clinical psychologist, who had examined and tested Appellant during his pretrial mental competency evaluations. The Sixth Amendment of the United States Constitution and Section Eleven of the Kentucky Constitution grant the accused the right to have compulsory process for obtaining witnesses in his favor. The Uniform Act to Secure the Attendance of Witnesses from Within or Without a State in Criminal Proceedings, codified in KRS 421.230 to KRS 421.270, establishes the means by which a defendant may secure the attendance of witnesses necessary for his defense. However, it provides that the trial court must certify the witness as material before signing a subpoena for an out-of-state witness. KRS 421.250; *see also Dillingham v. Commonwealth*, 995 S.W.2d 377, 382 (Ky.1999). The burden is

---

**5.** He cites his compulsion to represent himself as a symptom of his obsessive compulsive disorder and his narcissistic personality disorder.

**6.** Dr. Perri testified that Appellant had a history of paranoia, but not raging paranoia. Dr. Perri further testified that this history did not affect his competency to stand trial.

on the proponent of the witness to show materiality. *Id.*

In connection with the pretrial efforts to determine if Appellant was criminally responsible for the alleged crimes and if he was competent to stand trial, Dr. Auble examined Appellant and prepared a report setting forth her opinions and findings. By the time Appellant's trial began, Dr. Auble had moved her medical practice to Tennessee. Because Appellant believed Dr. Auble's testimony could be beneficial to his defense, on the first day of trial he sought to subpoena her pursuant to KRS 421.230–.270. Appellant argued to the trial court that her testimony would reinforce Dr. Perri's testimony concerning his extreme emotional disturbance defense.

Appellant's stand-by counsel, however, informed the court that Dr. Perri had relied on Dr. Auble's report, and therefore, as an expert, Dr. Perri could present the contents of Dr. Auble's report to the jury. Based upon that representation the trial court ruled that Dr. Auble was *not* a necessary or indispensable witness, and accordingly denied Appellant's request to subpoena Dr. Auble. The trial court buttressed its ruling by noting (incorrectly, as would later be seen) that defense team investigator, Becky Barnett, could testify to the historical information about Appellant's background that was also provided by Dr. Auble.

As it turned out, however, Dr. Perri had not received or relied upon Dr. Auble's report, and was therefore not able to inform the jury of its content. Moreover, despite its earlier indication to the contrary, the trial court did not allow Barnett's testimony about Appellant's background, based upon the hearsay rule. A hearing was held outside the presence of the jury to address the issue of Dr. Auble's report. The report was placed in by avowal, and the Commonwealth cites us to the following language:

> *The evaluation is not completed at this point.* I do not have many-records on [Appellant] . . .
>
> . . .
>
> From my knowledge of the case at this point, [Appellant's] behavior at the time of the offense was probably influenced by mental illness, though I am not certain whether an insanity defense could be supported.

(Emphasis added.)

In her avowal testimony, Barnett testified that Dr. Auble could not render a final opinion because she needed more information about Appellant. The Commonwealth contends, therefore, that because Dr. Auble's report was incomplete, it was inadmissible and would not have been admitted, even if Dr. Auble had been compelled to appear. Dr. Perri could not have relied upon the incomplete report in any event, and thus could not have testified concerning its contents. Thus, the Commonwealth argues, Appellant failed to establish the materiality of Dr. Auble's proposed testimony.

Appellant had attempted to initiate the first step of the process by moving the court to certify Dr. Auble as material and necessary to the proceedings. However, based upon misinformation of stand-by counsel regarding the completeness of the report and its use by Dr. Perri, the trial court's initial consideration of the motion was short-circuited. Based upon the facts as it understood them to be, the trial court correctly concluded that Dr. Auble's attendance at trial was unnecessary.[7] The

---

7. *Baraka v. Commonwealth,* 194 S.W.3d 313, 314–315 (Ky.2006) ("There is absolutely nothing improper about basing an expert opinion on 'facts and data . . . made known to the

trial court did not abuse its discretion based upon the information before it. KRE 703(a).[8]

We note that Dr. Auble's own report states that her "evaluation [of Appellant was] not completed" and there is no suggestion by Appellant that she later completed her evaluation. It follows, then, that even if Dr. Auble had been compelled to appear and testify, whatever opinion she expressed concerning Appellant's criminal responsibility or competence would be based upon an admittedly incomplete evaluation, thereby severely limiting its probative value. Any of her conclusions would have been merely preliminary and, for that reason, of questionable relevance. *Mabry v. Tunica County Sheriff's Dept.*, 911 So.2d 1038, 1043 (Miss.App.2005) ("When an expert's opinion is based upon an inadequate or incomplete examination, that opinion does not carry as much weight and has little or no probative value when compared to the opinion of an expert that has made a thorough and adequate examination.").

Moreover, Dr. Auble's testimony would not have aided Appellant's extreme emotional disturbance defense. EED is not a mental illness for which an expert's offering a medical opinion or diagnosis of EED would be relevant evidence. *McClellan v. Commonwealth*, 715 S.W.2d 464, 468 (Ky. 1986) ("Extreme emotional disturbance is something different from insanity or mental illness."). EED, rather, is "a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes." *Id.* at 468. Dr. Auble had no personal knowledge of Appellant's state of mind during the alleged crimes, and, it follows, was not competent to offer factual evidence to assist the jury on the issue.

From the above discussion we are persuaded that Appellant has failed to meet his burden of showing Dr. Auble's testimony would have been material and necessary to the proceeding. KRS 421.250(1). As such, we find no error in the trial court's denial of Appellant's request for an out-of-state subpoena to compel the presence of Dr. Auble.

## VI. THE USE OF THE PRIOR ATTORNEY'S LETTER DID NOT VIOLATE THE ATTORNEY–CLIENT PRIVILEGE AND THE HEARSAY TESTIMONY ELICITED FROM COUNSEL WAS HARMLESS ERROR

Appellant's final argument arises from the Commonwealth's use, upon cross-examination, of a letter written to him by Bette Niemi, his prior counsel. At trial, Appellant called Niemi to testify on his behalf. Prior to her testimony, and outside the presence of the jury, the trial court discussed Appellant's decision to call Niemi as a witness and cautioned him that putting her on the witness stand could waive his protections under the attorney-client privilege as to those matters he raised on direct examination.

expert at or before the hearing.' "); *Combs v. Stortz,* 276 S.W.3d 282 (Ky.App.2009) ("Clearly, KRE 703 allows for the expert's reliance on facts or data, including hearsay, which would otherwise not be admissible into evidence, provided that it is of a type reasonably relied upon by experts in that field.").

8. "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

Undeterred, Appellant asked Niemi if she had discovered whether a rape kit had been used to determine if Renshaw was raped or had engaged in sexual intercourse in the hours preceding her death. To refresh her memory, he provided Niemi with a copy of a four-page letter she had written to him in which she summarized the things she had discussed with Appellant during her representation. Appellant perceived this information to be relevant as it may have tended to support his defense that he acted under the influence of extreme emotional disturbance generated by Renshaw's promiscuous sexual activity. Appellant also asked Niemi a series of accusatory questions implying that she had made numerous negative statements to him and about him, and implied that she had collaborated with the prosecution against him. Niemi responded to that line of questions with references to the content of the letter.

Over Appellant's objection, the Commonwealth was permitted to see the letter and to cross-examine Niemi about its content relating to her knowledge of whether Renshaw's body had been subjected to a rape examination, and about Niemi's investigation of Renshaw's sexual history.[9] Appellant now argues the disclosure of the letter's contents violated his attorney-client privilege under KRE 503 and that Niemi's testimony, on cross-examination, about the investigation into Ms. Renshaw's sexual history is inadmissible hearsay.

### A. Attorney–Client Privilege

■ As a general rule, "[a] client has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made for the purpose of facilitating the rendition of pro-

fessional legal services to the client...." KRE 503(b). The August 17, 2006, letter was a communication from Appellant's then-appointed attorney directly concerning his pending case, and thus squarely falls within the privilege.

■ Nevertheless, it is well established that the privilege may be waived. *See 3M Co. v. Engle*, 328 S.W.3d 184, 188–189 (Ky.2010) ("[A] client 'waives the privilege if he ... voluntarily discloses or consents to disclosure of any significant part of the privilege matter.'"). The waiver may be explicit or implied. Professor Lawson explains implied waiver of the privilege as follows:

> The client may waive the [attorney-client] privilege by taking positions that place the substance of the communications in issue.... [T]he inquiry for the trial court 'is whether allowing the privilege to protect against disclosure of the information would be manifestly unfair to the opposing party.'

Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 5.05[10], at 363–64 (4th ed.2003 & 2010 supp.) (footnotes omitted) (quoting *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1326 (9th Cir.1995)).

Here, Appellant did indeed take positions that placed the substance of the communication in issue. He examined Niemi about the contents of the letter and had her review it to refresh her memory. Accordingly, the contents of the letter were placed into issue by the efforts of Appellant himself, and we are persuaded that he thereby waived his attorney-client privilege regarding the letter. The trial court did not abuse its discretion in holding as such.

---

9. Niemi testified that she had made numerous requests for the Commonwealth to provide the results of any such tests. None were provided, and she believed no such examination had been administered.

## B. Hearsay

In connection with this argument, Appellant also contends that the use of the letter resulted in a hearsay violation. In particular, Appellant argues that Niemi's testimony regarding the results of the investigation into Renshaw's sexual history constituted hearsay. While it appears that he did not contemporaneously object to the Commonwealth's questioning in this area, in consideration of his more general objection at the bench to the Commonwealth's use of the letter, and our difficulty in discerning the bench discussions from the video record, we will treat the claim of error as preserved.

On cross-examination by the Commonwealth, Niemi testified that her office had investigated the Appellant's claim that Renshaw was engaged in promiscuous sexual activity when he headed home from Oklahoma, and that the investigation involved asking dozens of men whether they had sexual relations with Ms. Renshaw just prior to her murder. She testified that none of the men who were interviewed admitted to having a sexual relationship with Ms. Renshaw. Appellant argues on appeal that that testimony was inadmissible hearsay (or double-hearsay, from the declarant to the investigator to Niemi.)

Hearsay is defined as a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted. KRE 801(c). In effect, Niemi testified that all of the men who were interviewed denied having had sex with Renshaw. Thus stated, it is clear that this testimony constituted the repetition of many out-of-court statements uttered by the men who were interviewed. Appellant contends that the Commonwealth elicited that testimony to prove the truth of the matter asserted, and thereby refute Appellant's claim that he overheard on the phone Renshaw having sex with many men. In that context, the statement would be hearsay. The Commonwealth posits that testimony was offered, not for the truth of the matter asserted, but to show Niemi's belief that the results of a rape examination upon Renshaw's body would not have supported Appellant's defense. The relevance of Niemi's belief in that regard is not immediately apparent, and so we will proceed under Appellant's contention that the testimony was hearsay.

Even if Niemi's testimony was hearsay, we can only regard it as harmless. The inability to identify any men to confirm Renshaw's promiscuous activity shortly before her murder is of minimal probative value. Really, it proves nothing except that her investigator failed to find a witness to support Appellant's story. That failure does not undermine Appellant's story itself, which he used to support an EED claim. The outcome of his attorney's investigation neither proves nor disproves his claim of what he heard over the phone. As such, we are convinced that any error in the admission of the hearsay evidence did not substantially sway the verdict, and was, accordingly, harmless. *Winstead v. Commonwealth*, 283 S.W.3d 678, 688–89 (Ky.2009).

## VII. CONCLUSION

For the foregoing reasons, the judgment of the Warren Circuit Court is affirmed.

All sitting. All concur.