# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED:  SEPTEMBER 22, 2022
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0150-MR

GREGORY DEAN ROE                                                        APPELLANT


V.                  ON APPEAL FROM FAYETTE CIRCUIT COURT
                    HONORABLE THOMAS L. TRAVIS, JUDGE
                                NO. 18-CR-01472


COMMONWEALTH OF KENTUCKY                                        APPELLEE


## MEMORANDUM OPINION OF THE COURT

## AFFIRMING


In a case involving two separate incidents and victims, Gregory Dean Roe was convicted at a jury trial in Fayette Circuit Court of two counts each of rape, sodomy, kidnapping, assault, and terroristic threatening, and a single count of tampering with physical evidence.  He was sentenced to a total of forty years' imprisonment and appeals from the trial court's judgment to this Court as a matter of right.[1]  After a careful review, we affirm.

N. B. testified she had known Roe for twenty years.  He was a friend of her boyfriend, Mark Chaffins, and she had previously taken drugs with Roe. On the evening of June 3, 2018, she was walking to a nearby Thornton's

---

[1] Ky. Const. § 100(2)(b).

convenience store located on 7th Street with her cousin, who was a prostitute. A pickup truck pulled up beside them. Roe was seated in the passenger seat. He asked about her boyfriend, whom she said was in jail, then asked if she wanted to get high. She declined but he responded by grabbing her arm and pulling her into the truck. He seemed to be holding a pocketknife. The truck drove away, eventually turning into an alley where she and Roe exited. They were arguing but she did not scream for help. After the driver of the truck drove off, they walked up a hill to a parking lot behind a nearby business, Powers Transmission on Winchester Road, where Roe had indicated his girlfriend's inoperable car was parked.

N.B. testified Roe's demeanor suddenly changed. He grabbed her arm and pulled her into the back seat of a gray Nissan Maxima, telling her to "[t]ake off your clothes." He pulled down his pants and made her perform oral sex. When he reached to take mace out of the glove compartment, his elbow hit the left side of her eye causing her nose to bleed. He performed oral sex on her, penetrated her vagina with his hands and penis, and touched her anus. Roe's actions continued for hours, all the while he continued to brandish his knife. On a few occasions, Roe let N.B. step naked next to the vehicle's back door to urinate. When she tried to break free and call for help, he grabbed her hair and pulled her back into the parked car. She feared being stabbed. Finally, she broke free and ran to the sidewalk in front of the transmission shop. Roe got her clothes and flip flops, ran to where she was standing, spit in her face,

2

and threw the items at her, shouting, "Here bitch. Go tell your daddy. Go tell Mark." She put on her clothes and ran home.

Upon arriving at her residence, N.B. told her father to call 911 because she had been kidnapped and raped. Her father testified another female had helped his daughter to their house. A short while later, at the University of Kentucky Hospital, a sexual assault nurse examiner (SANE) used a sexual assault kit to collect evidence.

Roe's version was markedly different. He testified he and N.B. had engaged in consensual sex intermittently for sixteen years, including ten times for money. On the night of June 3, 2018, he had purchased some cocaine. An unnamed man with a truck then agreed to drive him to Powers Transmission for $5. While the two men were en route to Powers Transmission, Roe encountered N.B. and two other girls at a street corner. N.B. yelled for Roe to stop and asked where he was going. He told her he was working security at Powers Transmission. N.B. asked if she could join him and whether he had anything. He advised he had some drugs and a little money but, as in the past, expected a sexual favor in return. N.B. then got into the truck and accompanied Roe to the transmission shop. After being dropped off, the two walked up a hill to a Nissan automobile parked in the rear lot of the business. They both climbed into the back seat of the car where they smoked crack cocaine and she used heroin. N.B. then offered several favors for $80, but he counteroffered with $30 plus some drugs. She agreed and the two engaged in consensual, contractual oral sex. He denied any kind of vaginal or anal sex,

3

nor touching her private areas. After thirty-five minutes, N.B. said she had been there too long, her boyfriend was going to get mad, and she had to go. She then ran off. Roe watched her until she got about two and a half blocks from her house. Fifteen minutes later, Roe said N.B. came back with two black men and demanded $75. When Roe refused, N.B. swung a metal object at him but he was able to duck to avoid the blow. Roe struck N.B. with his palm and produced pepper spray to defend himself. The two men intervened, telling him not to spray them. They told N.B. to leave. As the three departed, N.B. told Roe he was going to jail. He responded by threatening to call the police, which he did. When the police arrived at the lot, Roe did not tell them about the oral sex, because he did not want his fiancée to find out.

S.K. alleged she was raped on September 7, 2018. She was a self-professed drug addict who drank. Her now-deceased roommate, Robin Rose, was an alcoholic. That evening, after using drugs and alcohol, the two women decided to walk to a nearby Thornton's convenience store. The business was located about one mile from Powers Transmission. As they were walking, S.K. testified a man pulled up on a moped and asked if the two women wanted to smoke crack cocaine and get high. S.K. responded affirmatively. The man identified himself as "Greg," and S.K. subsequently picked him out of a police photo line-up, identifying him as Roe. S.K. and her roommate invited Roe to their residence, but he declined. Instead, he insisted the three proceed to a location up the road.

4

Rose continued to walk toward Thornton's, but S.K. got on the back of the moped, seated behind Roe. She quickly became scared and wanted to get off after he ran some traffic signs or lights, but the two ultimately arrived at an alley located behind Powers Transmission. Roe drove the moped up a hill, stopping near some vehicles parked in the rear lot. Roe told her he had left his wallet in one of the cars. He then got into a sports utility vehicle, grabbed what looked like a crack pipe, lit it, and they both smoked its contents. When she joined him, she immediately realized the substance in the pipe was not crack. S.K. was seated beside Roe in the back seat of the vehicle with her feet still touching the ground outside of the vehicle. When she tried to pull away and stand up, Roe pulled her back into the car by her ponytail and began punching her head, shouting, "You crack whores and prostitutes think you're just going to get free drink and drugs off of everybody. Well, it's not going to be me anymore, and I'm not putting up with it. You are going to pay for yours today, whore."

Roe then told S.K. to get naked as he opened a knife and demanded oral sex. He said, "If you bite me, I will cut you." S.K. took her dentures out, and Roe made her perform oral sex several times in addition to putting his fingers inside her vagina and anus. Afterward, Roe opened a beer, poured some for S.K., and started to relax a bit before laying the knife down. S.K. grabbed the knife, jumped out of the back seat, and threw the knife under another vehicle. Roe caught her, beat her, and said, "If you just get dressed right now, I'll give you $100, and you won't have to say anything happened right now." S.K.

5

broke away and ran naked to a nearby Speedway convenience store. She had noticeable bruising on her face and a man called 911. Even so, she refused medical treatment and examination.

Again, Roe's version of the evening's events differed significantly. He testified he had purchased $50 of crack cocaine and a $5 scouring pad for use in smoking crack. When he stopped his moped to pack his cigarettes, two females ran over from a nearby Thornton's convenience store asking for a cigarette. S.K. asked, "You looking?" He replied, "Well if it looks something like you, I might be." S.K. then pulled up her long summer dress. She was not wearing any underwear and offered, "You looking for something like this? For $100, me and my girlfriend will both do you." Roe replied he had only $50, was not looking for sex, but might be interested in oral sex. S.K. got on the back of his moped and the two left together, leaving Rose behind.

Roe and S.K. proceeded on the moped to Powers Transmission, where he took out his knife, cut the scouring pad, and tossed his knife under a vehicle. Roe then climbed into the driver's side back seat of a Nissan belonging to his girlfriend. S.K. walked to the other side, sat down beside him, and they smoked some crack. At some point, Roe pulled down his pants and handed S.K. $40. S.K. took out her dentures and engaged in oral sex for approximately forty seconds. At that point, she pulled out a needle from her breasts and injected herself with what she said was crystal meth. She then took another hit from the crack pipe before yelling, "Ahhhh, I've got bugs on me. I've got bugs on me." She thereupon jumped out of the parked vehicle, fell, ran down

6

the hill, and turned right before he lost sight of her. He had no further contact with her that night. He left five to ten minutes later, throwing away S.K.'s dentures because he did not want his fiancé to find them in her car.

Three months later, S.K. reported the rape, and police found the knife under a vehicle still parked in the transmission shop's back lot. Roe was arrested on charges from both incidents.

Prior to trial, the Commonwealth's motion to introduce evidence of Roe's alleged attempted sexual attack on a third victim, A.N., was granted. At trial, Officer Alex Holland testified he was dispatched to a Speedway on Winchester Road on May 27, 2018, eight days before N.B.'s rape. A.N. reported she was assaulted behind Powers Transmission but escaped to seek help at the Speedway. After Officer Holland arrived, he asked to be taken to the location of the assault. A.N. took him to a gray Nissan Maxima parked behind Powers Transmission. It was the same vehicle N.B. described when she reported her assault the next week. Roe was on the scene when Officer Holland and A.N. arrived. In his own defense, Roe told Officer Holland that he had previously confronted A.N. and two black males and that one of the men had stuck a gun in Roe's face. Officer Holland testified Roe told a similar story about two black males the next week during the investigation of the incident with N.B.

When Roe presented trial testimony inconsistent with his prior statements, the Commonwealth called Ben Coolbear, the foreman of the grand jury, for the purpose of impeaching Roe with his own grand jury testimony. Coolbear indicated the grand jury had heard testimony from Roe about the

7

incidents involving both N.B. and S.K.  The Commonwealth then played an audio recording of Roe's grand jury testimony, which Coolbear testified was a fair and accurate representation of his testimony.  Coolbear stated that after hearing other testimony, the grand jury indicted Roe relative to both incidents.

After hearing all the evidence, the jury found Roe guilty of all charges.  It recommended a sentence of twenty years on each count of rape, kidnapping, and sodomy, five years on tampering, and twelve months on the remaining charges.  The jury recommended the sentence on one count of rape run consecutive to the other, with all the remaining sentences to run concurrently, for a total of forty years' imprisonment.  The trial court imposed the recommended sentence.  This appeal followed.

Roe alleges five errors in seeking reversal.  First, he contends the trial court erred by failing to enter a directed verdict on the kidnapping charges in accordance with the kidnapping exemption statute.[2]  Second, he argues the trial court erred in failing to enter a directed verdict on the rape and sodomy charges.  Third, he alleges the trial court erred in allowing the Commonwealth to present KRE 404(b)[3] evidence.  Fourth, he contends the trial court erred in allowing the grand jury foreman to testify.  Fifth and finally, he avers improper

---

[2] Kentucky Revised Statutes (KRS) 509.050.

[3] Kentucky Rules of Evidence (KRE) 404(b) provides evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith but may be admissible if offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

comments and questioning by the Commonwealth were substantially prejudicial and denied him due process.

Roe first argues he should have been granted directed verdicts on the kidnapping charges because of the kidnapping exemption statute, KRS 509.050. Specifically, he contends any interference with the liberty of N.B. or S.K. occurred incidental to and contemporaneously with alleged acts of rape and sodomy. Consequently, he believes the kidnapping charges should have merged with the other charges.

KRS 509.050 provides, in pertinent part:

> A person may not be convicted of . . . kidnapping when his criminal purpose is the commission of an offense defined outside this chapter and his interference with the victim's liberty occurs immediately with and incidental to the commission of that offense, unless the interference exceeds that which is ordinarily incident to commission of the offense which is the objective of his criminal purpose.

The purpose of the statutory exemption "is to prevent misuse of the kidnapping statute to secure greater punitive sanctions for rape, robbery, and other offenses which have as an essential or incidental element a restriction of another's liberty." *Gilbert v. Commonwealth*, 637 S.W.2d 632, 635 (Ky. 1982). We approach the application of the exemption statute on a case-by-case basis. *Id.*

> Generally we have determined that if the victim of a crime is going to be restrained of his liberty in order to facilitate its commission, the restraint will have to be close in distance and brief in time for the exemption to apply. Otherwise the offender will be guilty of a kidnapping charge as well. *Id.* (citation and internal quotation marks omitted).

9

We apply a three-pronged test to determine whether the kidnapping exemption statute is applicable.

> First, the underlying criminal purpose must be the commission of a crime defined outside of KRS 509. Second, the interference with the victim's liberty must have occurred immediately with or incidental to the commission of the underlying intended crime. Third, the interference with the victim's liberty must not exceed that which is ordinarily incident to the commission of the underlying crime. All three prongs must be satisfied in order for the exemption to apply.

*Wood v. Commonwealth*, 178 S.W.3d 500, 515 (Ky. 2005) (citation omitted). The kidnapping exemption statute is to be strictly construed with the burden upon a defendant to show that it should apply. *Murphy v. Commonwealth*, 50 S.W.3d 173, 180 (Ky. 2001).

Assault and related offenses are defined in KRS Chapter 508, while sex offenses are in KRS Chapter 510. Thus, there is no dispute the first prong is satisfied.

Under the second prong, the interference with the liberty of N.B. and S.K. must have been concomitant with the underlying crime. Roe restrained N.B. and S.K. immediately with and incidental to the other crimes involved under the facts of this case so that those other underlying crimes could be committed. The two women were restrained by force when Roe assaulted them and by implied force when he threatened them with a knife. Further, "[t]he restraint was 'close in distance and brief in time,' which *seems* to satisfy the immediately-with-and-incidental-to requirement." *Stinnett v. Commonwealth*, 364 S.W.3d 70, 78 (Ky. 2011) (quoting *Timmons v. Commonwealth*, 555 S.W.2d

10

234, 241 (Ky. 1977) (emphasis added)). But the statute requires a third determination.

Under the third prong, the interference with the victim's liberty must not go beyond "that which is ordinarily incident to commission of the offense which is the objective of his criminal purpose," KRS 509.050, for the exemption to apply and preclude the kidnapping charges.

> The third prong of this test presents a more nebulous consideration . . . . However, it would appear that the drafters of KRS 509.050 envisioned for prong three to be read in conjunction with prong two of the test. When read together it seems evident that the intent of the latter two prongs is to ensure that the means of restraint effectuated in committing the underlying crime are of such a nature that they are a part of, or incident to, the act of committing the crime itself and, as such, temporally coincide with the commission of the crime. If the deprivation of liberty segues into a more pronounced, prolonged, or excessive detainment, then such restraint should no longer be within the confines of the exemption statute and the accused should be held separately accountable for those actions. *See Murphy v. Commonwealth,* 50 S.W.3d 173 (Ky. 2001) (restraint of 10 hours exceeded that necessary for defendants to commit burglary); *see, e.g., Griffin v. Commonwealth,* 576 S.W.2d 514 (Ky. 1978) (restraint of victim one and a half hours after victim dragged from vehicle exceeded what was ordinarily incident to commit sodomy).

*Hatfield v. Commonwealth,* 250 S.W.3d 590, 600 (Ky. 2008).

In *Stinnett,* evidence showed the defendant had multiple intents. This Court noted, "[i]n analyzing application of the exemption, a defendant's actions will define whether the exemption applies, not his intentions." 364 S.W.3d at 79. We held a trial court, on a case by case basis, "must actually apply the exemption statute to determine whether the restraint that was a part of the other crime . . . was such that it exceeded the restraint necessary to commit

11

the other crime." *Id.* at 77. We ultimately held Stinnett "could have killed [the victim] without taking an extended time to terrorize her. . . . Appellant engaged in substantial detours from his other crime—the ultimately deadly assault—to humiliate and degrade his victim." *Id.* at 78. Thus, there was sufficient evidence to support charges for both kidnapping and murder.

We turn now to N.B.'s encounter with Roe. He transported her to the crime scene against her will, both by physical force and by implying he had a knife. The restraint of the victim for hours, or "hours and hours" as N.B. testified, interfered with her liberty and exceeded the scope of what was ordinarily incident to commit the underlying crime, making the kidnapping exemption statute inapplicable. Even though the exact timeline is uncertain, the restraint of N.B. was somewhere between the ten hours the victim was restrained in *Murphy*, 50 S.W.3d 173, and the one and a half hours the victim was restrained in *Griffin*, 576 S.W.2d 514.

Roe had multiple intents regarding his plans with N.B. N.B. was forcibly restrained before being transported to Powers Transmission. Roe drank and used drugs with N.B. while she was not free to leave. The jury also viewed photographic evidence of a battered N.B. who had a fractured nose, a black eye, and bruises and swelling on both sides of her head. The partying and assault were detours from the underlying crimes of rape and sodomy. Thus, Roe was not entitled to application of the kidnapping exemption statute.

Turning next to S.K.'s encounter with Roe, she voluntarily got on the back of his moped to go with him to get high. When Roe lit the crack pipe

12

inside the vehicle at Powers Transmission, S.K. testified she immediately realized it was not crack and attempted to leave the crime scene. At that point Roe grabbed her hair, pulled her back into the vehicle against her will, beat her, and brandished his knife, thereby restraining her by express or implied force for the rest of the encounter.

When the prosecutor asked what went through S.K.'s head, S.K. answered:

> He had beat my head the whole time I was in that car, the whole time I was in that car, pretty much. I didn't know if he was trying to kill me, or he's just going to beat me up, or what. I mean there never was no intent. The intent was just to go party, you know?

S.K. later testified she escaped when Roe started to relax a little bit and she saw her chance to escape, running naked to a convenience store.

As the perpetrator did in *Stinnett,* Roe even spoke about forcing S.K. to make some real money, presumably through prostitution. With Roe's remarks about no longer putting up with "you crack whores and prostitutes" in conjunction with his extended beating of her, the drug use, and conversations with S.K., her detention was clearly longer than necessary to accomplish rape and sodomy. Roe took substantial detours from the crimes of rape and sodomy to assault, humiliate, and degrade S.K. Notably, one of the elements that can constitute kidnapping is when the perpetrator's intent is "[t]o inflict bodily injury or to terrorize the victim." KRS 509.040(1)(c). Based on the foregoing, evidence existed to support kidnapping in addition to the other crimes. Again, Roe was not entitled to the benefit of the kidnapping exemption statute.

13

Second, Roe argues the trial court erred in failing to enter a directed verdict on the rape and sodomy charges. He contends no underlying facts support he sexually touched or engaged in sexual intercourse or deviate sexual intercourse by forcible compulsion with anyone, and inferences suggested by the Commonwealth are unsupported by the record. He further argues S.K.'s refusal of a SANE examination and attempt to run when arrested on a warrant days before her testimony undermines her credibility.

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.
>
> On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

*Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). "It should be remembered that the trial court is certainly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence. Obviously, there must be evidence of substance." *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983).

Roe's attack on the weight and credibility of the witnesses does not form a basis for granting a directed verdict. Both N.B. and S.K. testified Roe forced each of them to perform oral sex and penetrated their vaginas and anuses with his fingers, penis, or both. Their testimony satisfied all the elements of first-

14

degree rape and first-degree sodomy. Roe admitted to having sexual encounters with both women. In N.B.'s case, the SANE examination collected evidence which indicated a presumptively positive test result for N.B.'s saliva on Roe's penis. Both women provided forceful testimony with similarities in their stories although they had not met.

"[T]he Commonwealth need only produce more than a 'mere scintilla' of evidence to defeat a defendant's motion for a directed verdict." *Commonwealth v. James*, 586 S.W.3d 717, 721 (Ky. 2019) (quoting *Sawhill*, 660 S.W.2d at 5). Here, there was evidence of substance, and, under the evidence as a whole, it was not clearly unreasonable for a jury to find guilt. *Benham*, 186 S.W.2d at 187.

Third, Roe argues the trial court erred in allowing the Commonwealth to present KRE 404(b) evidence regarding a prior act between Roe and another female, A.N., on May 27, 2018. When the Commonwealth filed a motion to introduce evidence of Roe's alleged attempted "sexual assault" on A.N., it alleged Roe saw A.N. in the parking lot of Powers Transmissions, grabbed her, forcibly pulled her to the same gray car in which N.B. was attacked one week later, and assaulted her before she was able to escape and run to the Speedway convenience store. Although Roe was never charged with any crimes perpetrated upon A.N., the Commonwealth argued this prior act was admissible and relevant. Particularly, the Commonwealth asserted the evidence from the prior incident with A.N. was indicative of Roe's criminal pattern or "signature crime" and established his intent and identity.

15

Roe objected but failed to state his objection with any particularity and filed no written response. Instead, Roe's counsel merely affirmed the defense was familiar with how KRE 404(b) works and asked that their objection be noted on the record absent further explanation. The trial judge acknowledged Roe's objection and, "to the extent" an objection was being made, overruled it.

Roe now complains the Commonwealth's motion to allow KRE 404(b) evidence regarding his purported prior "sexual assault" of A.N. failed to mention use of a brick though Officer Holland thereafter testified at trial that his investigation of the earlier occurrence revealed A.N.'s assertion of Roe having assaulted her using a brick. Though not raised at trial, Roe complains the Commonwealth's motion referenced a "sexual assault" when no such evidence was proffered at trial. He further complains A.N.'s alleged assault involved an additional element—use of a brick—which was not alleged in relation to his assault charges relating to N.B. and S.K.

Under KRE 103(a)(1), to challenge a ruling admitting evidence as erroneous, a timely made objection or motion to strike must appear in the record, "stating the specific ground of objection, if the specific ground was not apparent from the context." "[A]ppellants will not be permitted to feed one can of worms to the trial judge and another to the appellate court." *Kennedy v. Commonwealth*, 544 S.W.2d 219, 222 (Ky. 1976), *overruled on other grounds by Wilburn v. Commonwealth*, 312 S.W.3d 321 (Ky. 2010). In other words,

> [a]n objection made in the trial court will not be treated in the appellate court as raising any question for review which is not within the scope of the objection as made, both as to the matter objected to and as to the grounds of the objection, so that the

16

question may be fairly held to have been brought to the attention of the trial court.

*Richardson v. Commonwealth*, 483 S.W.2d 105, 106 (Ky. 1972) (internal quotation marks and citations omitted).  Although Roe objected to the introduction of the KRE 404(b) evidence regarding A.N., the record is devoid of any specific ground for the objection.  Roe's argument on appeal does not mirror what was asserted to the trial court.  Thus, the argument will be treated in this appeal as unpreserved.

"Ordinarily, when an issue is unpreserved at the trial court, this Court will not review it unless a request for palpable error review under RCr[4] 10.26 is made and briefed by the appellant." *Webster v. Commonwealth*, 438 S.W.3d 321, 325 (Ky. 2014) (citing *Shepard v. Commonwealth*, 251 S.W.3d 309, 316 (Ky. 2008)).  Roe did not request review for palpable error.  Therefore, further analysis of his argument is unwarranted.

Fourth, Roe argues the trial court committed reversible error when it allowed the grand jury foreman to testify for the Commonwealth.  He contends the grand jury proceedings should have been kept secret, the jury improperly heard the grand jury had indicted Roe, and "it is always improper for a prosecutor to suggest that a defendant is guilty merely because he is being prosecuted or has been indicted." *United States v. Bess*, 593 F.2d 749, 754 (6th Cir. 1979).

---

[4] Kentucky Rules of Criminal Procedure.

Roe concedes this argument is unpreserved and requests review for palpable error under RCr 10.26. "[W]hat a palpable error analysis boils down to is whether the reviewing court believes there is a substantial possibility that the result in the case would have been different without the error." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006) (citation and internal quotation marks omitted).

> An error is palpable only if it is shocking or jurisprudentially intolerable. In order to demonstrate an error rises to the level of a palpable error, the party claiming palpable error must show a probability of a different result or [an] error so fundamental as to threaten a defendant's entitlement to due process of law.

*Allen v. Commonwealth*, 286 S.W.3d 221, 226 (Ky. 2009) (internal quotation marks and citations omitted).

Coolbear's testimony that the grand jury indicted Roe did not affect the fairness of the proceedings. Roe's grand jury testimony was probative of his credibility because it contained details either omitted or contradicted by other statements he made to his sister on a recorded jail call, to law enforcement investigating the case, and in testimony at trial. Further, Roe's counsel clarified during cross-examination that the standard to indict was only probable cause, and the prosecutor did not say or suggest Roe was guilty simply because he had been indicted or was being prosecuted.

While RCr 5.24 promotes the policy of keeping grand jury proceedings and testimony secret in most instances, such secrecy is "subject to the authority of the court at any time to direct otherwise." RCr 5.24(1). The general purpose for

18

keeping secret the proceedings in the grand jury room is to insure a full and free investigation of all offenses, and that the witnesses who appear before that body may know that what they say will be held in confidence. 12 R. C. L. p. 1039, states the rule to be that it is the policy of the law to require the utmost secrecy as to the grand jury's proceedings while the grand jury is in session; but the purposes of this policy of the law are largely accomplished, so far as concerns the evidence adduced, after the indictment has been found and the accused has been taken into custody and the grand jury finally discharged. **The witness has no privilege to have his testimony treated as a confidential communication, and his testimony may be disclosed, whenever it becomes material to the administration of justice.**

*Turk v. Martin*, 232 Ky. 479, 23 S.W.2d 937, 939 (1930) (emphasis added).

Admitting Coolbear's testimony was not improper. No palpable error occurred.

Fifth and finally, Roe argues various comments and questioning by the Commonwealth relating to Roe's prior silence and his opportunity to have heard other witnesses testify prior to offering his own testimony were substantially prejudicial and amounted to a denial of due process. Roe admits this issue is unpreserved, and requests palpable error review.

At the start of Roe's cross-examination, the prosecutor challenged Roe about being "the first witness who's had the privilege of hearing all the other witnesses testify" and being "the first person that got to sit there and listen to all the other witnesses testify and then . . . get to testify after all of that." Roe asserts this was improper because he has a right not to testify and, if he chooses to testify, does not control the order of presentation of proof. Roe alleges "[t]he Commonwealth made it sound like it was a strategic decision to

19

wait until after everyone else testifies and then change his testimony accordingly."

However, other than asserting the fundamental unfairness of these statements, Roe offers nothing of substance nor any case law in support of his contentions. We will not search the record to construct Roe's argument for him, nor will this Court undergo a fishing expedition to find support for underdeveloped arguments. "Even when briefs have been filed, a reviewing court will generally confine itself to errors pointed out in the briefs and will not search the record for errors." *Milby v. Mears*, 580 S.W.2d 724, 727 (Ky. App. 1979). Bald assertions of error, totally lacking in support in the law or record, are insufficient to justify relief. We discern no palpable error.

Roe further argues his silence was improperly used against him when he was cross-examined on three separate matters, namely to confirm: he had not told police or his sister he had ten prior sexual encounters with N.B.; he had not mentioned he was partying and drinking with N.B.; and he "didn't stick around" to speak to police about the incident involving S.K. but he instead left town. Roe argues "[t]he Commonwealth is prohibited from introducing evidence or commenting in any manner on a defendant's silence once that defendant has been informed of his rights and taken into custody." *Hunt v. Commonwealth*, 304 S.W.3d 15, 35 (Ky. 2009) (citing *Doyle v. Ohio*, 426 U.S. 610 (1976), and *Romans v. Commonwealth*, 547 S.W.2d 128, 130 (Ky. 1977)).

However, we have indicated

not every isolated instance referring to post-arrest silence will be reversible error. It is only reversible error where post-arrest silence

20

> is deliberately used to impeach an explanation subsequently
> offered at trial or where there is a similar reason to believe the
> defendant has been prejudiced by reference to the exercise of his
> constitutional right.

*Id.* at 36. Further, the United States Supreme Court has recognized the Fifth Amendment is not violated when a defendant testifies in his own defense and is impeached with his prior silence, concluding a defendant was subject to cross-examination and impeachment of his credibility just like any other witness. *Jenkins v. Anderson*, 447 U.S. 231, 235-36 (1980).

Moreover, Roe never invoked his right to remain silent. Instead, he offered numerous conflicting statements. The Commonwealth's questions were properly tailored to challenge Roe's credibility and were not aimed to prejudice him for exercising a Constitutional right. We discern no error.

Lastly, although Roe failed to object at trial, he now argues it was improper for the prosecutor to ask him whether other witnesses were lying. The prosecutor asked Roe if he recalled stating "there was no knife involved? Everybody's lying? Do you remember that?"

In *Moss v. Commonwealth*, 949 S.W.2d 579 (Ky. 1997), the prosecutor badgered the defendant into answering a question regarding whether a police officer was "lying." This Court held "[a] witness should not be required to characterize the testimony of another witness, particularly a well-respected police officer, as lying." *Id.* at 583. Nevertheless, the claim of error was not preserved, and this Court declined to find palpable error.

Here, after Roe finally admitted at trial there was a knife, the prosecutor merely asked if he remembered giving contrary prior statements and claiming

everyone else was lying when they had asserted he had brandished a knife. Roe was not badgered into characterizing another witness as being untruthful, but instead was questioned regarding his own conflicting testimony. This is substantially different from the situation presented in *Moss*. However, like in *Moss*, Roe's "failure to object and our failure to regard this as palpable error precludes relief." *Id.*

For the foregoing reasons, the judgment of the Fayette Circuit Court is affirmed.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Roy A. Durham II
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Robert Baldridge
Assistant Attorney General