RENDERED: OCTOBER 23, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0314-MR

JOSEPH S. MASTERS                                           APPELLANT

                 ON APPEAL FROM KNOX CIRCUIT COURT
V.                  HONORABLE GREGORY A. LAY, JUDGE
                        NO. 21-CR-00129-001

COMMONWEALTH OF KENTUCKY                       APPELLEE

**OPINION OF THE COURT BY JUSTICE CONLEY**

**<u>AFFIRMING IN PART, REVERSING IN PART, AND REMANDING</u>**

This case is before the Court as a matter of right following the conviction of the Appellant, Joseph Masters, of murder, first-degree burglary, and four counts of unlawful imprisonment. He was sentenced to thirty-five years in prison. He now appeals raising four allegations of error. First, he alleges a failure to give self-defense and imperfect self-defense instructions to the jury; second, an improper admission of hearsay testimony regarding the results of a rape kit; third, an improper admission of a copy of a lease in violation of KRE[1] 1003 and 1004; and last, a failure to conduct an adequate hearing regarding defense counsel's motion to withdraw. For the following reasons, we affirm the convictions for murder and four counts of unlawful imprisonment. We reverse

---

[1] Kentucky Rules of Evidence.

the conviction for first-degree burglary. The sentence of imprisonment for thirty-five years is affirmed.

## I.    Facts

Joseph Masters, a Marine Corps veteran, lived in a trailer in Knox County. An educated man (he has a Master's degree), he had fallen on hard times after the death of his grandparents. The Veteran's Administration had declared him 100% service-connected disabled due to a multitude of psychiatric issues. Living with him were his three daughters from his marriage with Kipenie Masters, as well as his sister and her children. Masters and Kipenie separated while living in Texas but had begun to reconcile; she was moving to Kentucky to be with her family. Masters decided to put his sister and her family in a different trailer. He contacted his landlord, Dennis Woods, about leasing another property. That property was 701 Hedden Flats Road.

Masters testified to an oral agreement between he and Woods to lease the property. Receipts show he spent at least $2,500 on furniture for the trailer. According to Masters, the trailer needed repairs, and he was busy fixing it up in preparation for the move. During that time, however, an old friend, Deborah Powers, needed a place to stay. Masters and Powers had a sexual affair prior to his reconciliation with Kipenie. Masters let Powers stay in the Hedden Flats trailer while he was fixing it up. At trial, Powers testified she had in fact leased the trailer with her then-boyfriend, Matthew Welsh, directly from Woods.

On July 29, 2021, Masters and Kipenie were at the house of Charles McVey where the two ingested methamphetamine. Powers texted Masters to

2

inform him of a party at the Hedden Flats trailer. He and Kipenie arrived shortly after midnight. At the trailer were Powers, Welsh, and their friends: Tommy Dean and his young son, and William Miller. The younger Dean was asleep by the time they arrived.

According to Masters, everyone was drunk when he and his wife arrived. They all played beer pong and danced. Miller gave the Masters moonshine and insinuated that something "a little extra" had been added to the liquor. Masters told Kipenie not to drink anymore of it. At some point a little before 3:00 a.m., Masters testified, the men approached him and proposed Kipenie and Powers have sex in front of them, asking what the price would be. Masters declined and informed Kipenie they were leaving. Masters went outside to his vehicle, began smoking a joint, and searching for another place to continue drinking. Kipenie came out a little later, frazzled and looking sick. She told Masters to take her home immediately. When they got home, Kipenie became hysterical and told Masters the three men—Welsh, Dean, and Miller—had raped her in the bathroom, vaginally, anally, and orally. She also alleged Powers had been standing outside the bathroom when it happened, and told her that is what she deserved for taking Masters away from her.

Masters initially wanted to call the police but decided against it. Instead, he chose to remove the three men from what he believed was his property. He called McVey and relayed what happened. Kipenie also detailed the allegations to McVey and his girlfriend, Laura White. White called Ethan Young to assist. All of them met at McVey's house, and the three men proceeded to Hedden

3

Flats while Kipenie stayed with White. White would later testify at trial that Kipenie's account of the rape began to change at the house before the men even left; she could not keep names and details "straight" and "certain things kept changing every time she'd repeat it." She also testified "her whole demeanor changed" after initially talking about the alleged rape from being "upset" to "just hanging out."

At approximately 6:00 a.m., the men arrived at Hedden Flats. Masters was armed with at least one knife, perhaps two. McVey had a taser which looked like a firearm. Young was armed with a baseball bat and revolver. Masters pried open the door to the trailer with his knife. He testified the door did not work properly and that he frequently had to pry it open while working at the trailer. In the living room, Miller was lying on the floor passed out. McVey woke him by hitting his throat with the taser and his head with the baseball bat. Masters woke Powers and Welsh and ordered them into the living room. He then woke Dean at knife point and ordered him to do the same. Fortunately, Masters was unaware of Dean's son and the boy remained undisturbed.

When all four alleged assailants were together, Masters then subjected them to what he called "enhanced interrogation." This was in fact nothing other than torture.[2] He compelled them to strip naked at knife point. He threatened

---

[2] The only definition of torture found in Kentucky law is Kentucky Revised Statutes (KRS) 525.135(1)(a), pertaining to abuse of cats and dogs, meaning "the intentional infliction of or subjection to extreme physical pain or serious injury or death to a dog or cat, motivated by intent or wanton disregard that causes, increases, or prolongs the pain or suffering of the dog or cat, including serious physical injury or

to kill them. He cut and stabbed Miller on his throat, chest, and near his eye. He cut Dean on his chest and neck and taped his hands together. He kept demanding they admit to raping his wife, yet everyone refused. Young would later testify that during this "enhanced interrogation" he began to believe they had not raped Kipenie.

At some point, Masters was accosting Miller, threatening to cut off his fingers if he did not confess. Masters' back, with a knife sticking out of his pocket or waistband, was exposed. Welsh leapt for the knife, tackling Masters. He gained control of the knife and stabbed Masters in his back. McVey reacted immediately and knocked Welsh off Masters. According to Masters, he tried to crawl away and saw Welsh approaching him with the knife. The two engaged in a struggle. Masters successfully regained possession of the knife and proceeded to stab Welsh numerous times "where [he] was trained to stab. . . ." Welsh retreated from the trailer to a neighbor's but succumbed to his wounds before the ambulance arrived.

McVey, Young, and Masters left immediately for McVey's house to pick up Kipenie. The Masters were driven to a hospital in Tennessee.[3] Masters remembered little about the events afterward, testifying he got to the hospital

---

infirmity" Congressional law defines torture as conduct "intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control[.]" 18 U.S.C.A. § 2340(1). This specifically includes "threatened infliction of severe physical pain or suffering[.]" *Id.* at (2). We do not cite these statutes as controlling authority but merely to demonstrate that Masters' actions are justifiably described as torture.

[3] Masters testified his mother worked at the nearest hospital in Kentucky, so he did not want to go there.

and the next thing he knew he was in jail. Kipenie had a rape kit performed while at the hospital but, according to Kentucky State Police, the hospital was Baptist Health in Corbin, not the hospital in Tennessee. The rape kit and subsequent DNA analysis was never introduced into evidence; no lab technician or nurse who performed the tests were ever called as witnesses, nor was Kipenie. Detectives William Howard and Jacob Middleton both testified a rape kit had been performed at the hospital when they arrived to interview her. Det. Middleton testified to collecting buccal swabs from Dean and Miller, while a blood sample was obtained at Welsh's autopsy, and sending them to the lab for comparison to the rape kit. He testified the rape kit showed no semen, saliva, or any foreign DNA on Kipenie. This testimony was not objected to at trial, but Masters now argues its admission was palpable error.

Masters' account of events is obviously not the only account. Powers would testify for the Commonwealth, and she generally testified no rape was possible as she and Kipenie had stayed together the entire time the night of the events. She also testified Masters and Kipenie had sex in the bathroom at approximately 3:00 a.m., and when they finished, she asked them to leave as the party had ended. Powers also disputed Masters' possession of the Hedden Flats property, testifying she and Welsh had signed a lease with the landlord. A copy of this lease was obtained from the Welsh family. Masters objected, arguing the copy violated the Best Evidence Rule and arguing the lease was not

properly authenticated because it lacked the signature of the landlord, and its dates were incongruent.[4]

Additionally, Masters argued the copy should be excluded because the Commonwealth violated the trial court's discovery order. The case had been prepared for two years yet the Commonwealth did not turn over a copy of the lease until the first day of trial. The Commonwealth responded that it had no reason to believe the possession of the trailer at Hedden Flats would be disputed until Masters' opening statement. The trial court overruled Masters' objections. It held Powers, being a signatory on the lease, could testify to its contents and properly authenticate the copy.

Young, Miller, and Dean would also testify. Young testified after Welsh stabbed Masters, Welsh attempted to flee but was stopped by McVey. Masters then came up behind him and began stabbing him. Miller and Dean would also testify Welsh attempted to flee after stabbing Masters, and both heard Masters say, "kill the motherf**ker," after being stabbed.

Prior to trial, in July 2023, Masters' appointed counsel moved to withdraw. He explained to the trial court that Masters refused to discuss the case with him. The trial court was not inclined to allow withdrawal on those grounds, noting if Masters refused to cooperate in his own defense that was his choice. Masters then sought to interject and was allowed to speak. He informed the trial court of numerous issues he had with counsel, including that they had only spoken twice for a total of one hour in the previous ten months; they

---

[4] The dates on the copy were for July 2021 to June 2021.

had not worked on his defense or gone over discovery; and, generally, that counsel had not investigated the case by obtaining medical records from the Veteran's Administration nor interviewing psychologists or other persons Masters had identified.[5] Counsel explained he had been in a car accident and broken his neck which had hampered his ability to prepare the case but that co-counsel had been on the case to help but Masters refused to talk to him as well. The trial court noted a local rule stating that withdrawal of counsel was not required after a trial date had been set. It also expressed its belief that Masters was seeking to create an issue for appeal. Lastly, even though Masters stated he had spoken with a private attorney, the trial court found that was not enough to grant the motion for withdrawal as said attorney had not entered an official appearance and was not present in the courtroom at the hearing.

Finally, Masters tendered proposed jury instructions including self-defense and imperfect self-defense. The trial court did not accept these instructions.[6] Masters now argues the trial court abused its discretion in failing to give these instructions. The Commonwealth argues this issue was not properly preserved, but even if it was, there was no abuse of discretion. We conclude the issue is preserved. Pursuant to RCr.[7] 9.54(2), we have held

> a party can preserve his objection to jury instructions in one of
> three alternative ways: (1) by offering an instruction; (2) by motion;

---

[5] Masters had by this time been determined competent to stand trial after a KCPC evaluation had been performed.

[6] Masters tendered extreme emotional disturbance instructions which the trial court accepted, and the jury subsequently rejected.

[7] Kentucky Rules of Criminal Procedure.

or (3) by making a specific objection before the court instructs the jury. The rule does not require any additional objection or filing so long as one of these three is satisfied.

*Jerome v. Commonwealth*, 653 S.W.3d 81, 85 (Ky. 2022) (internal citation omitted). We now proceed to the merits.

## II. Analysis
## A. No Abuse of Discretion in Refusing Requested Instructions

Masters' argument for self-defense and imperfect self-defense instructions is rather simple. He asserts after Welsh stabbed him in the back, he attempted to crawl away and was followed by the knife-wielding Welsh. The two then engaged in a life-or-death struggle for the knife, and Masters prevailed. In evaluating this issue, we have long observed,

> [i]t is not every assertion of such belief that is adequate to support a plea of self-defense. It is the whole circumstances which surround the incident that must be considered by the trial judge in deciding whether an instruction on self-defense is proper or whether an instruction on self-defense with limitations is proper.

*Stepp v. Commonwealth*, 608 S.W.2d 371, 374 (Ky. 1980).

We will not dwell on the many intricacies of KRS 503.060, "all of which, when mixed together in instructions with lesser included offenses of various relevant mental states, becomes incomprehensible to even the most educated." *Commonwealth v. Hasch*, 421 S.W.3d 349, 369 (Ky. 2013) (Scott, J., concurring). The trial court's decision to not instruct on self-defense and imperfect self-defense is not an abuse of discretion because "[o]ne who by his words and acts provokes and brings about a fight cannot claim self-defense. The law does not allow a man to create a bad or dangerous situation and then

9

fight his way out." *Townsend v. Commonwealth*, 474 S.W.2d 352, 354 (Ky. 1971). We have often reiterated this principle when discussing initial aggressor or provocation instructions. The purpose of these qualifications to a self-defense instruction is "to prevent a defendant from instigating a course of conduct then claiming he was acting in self-defense when that conduct unfolds." *Bowman v. Commonwealth*, 686 S.W.3d 230, 247 (Ky. 2024) (quoting *Conley v. Commonwealth*, 599 S.W.3d 756, 775 (Ky. 2019)).

*Townsend*, admittedly, occurs in the context of reviewing a denial of a motion for directed verdict but that is of little import. The rule is a general one, that a defendant may not claim deadly self-defense when his own unlawful actions give rise to a right to deadly self-defense in the victim. "If by their acts, words, or conduct a person showed a willingness to enter the conflict, or if by their words or acts the person invited it, the person must be held to have produced the necessity for slaying their adversary and cannot invoke the doctrine of self-defense." 40 C.J.S. *Homicide* § 198 (2025). Our law is not so absolute, as we allow deadly self-defense even for an initial aggressor so long as his initial aggression was non-deadly, and the victim responded with deadly force; or the initial aggressor in good faith withdraws from the encounter and effectively communicates that withdrawal. KRS 503.060(3).

In this case, Welsh and his companions were forced to strip naked, subjected to torturous practices by knife, and threatened with death if they did not confess to raping Kipenie. Masters created an environment of deadly physical force which justified Welsh in responding with deadly physical force of

10

his own. Welsh, seeing such an opportunity, acted—stabbing Masters in the back. Both Dean and Miller testified Masters then called for the death of Welsh, stating "kill the mother\*\*\*ker." Young, Masters' accomplice, along with Dean and Miller, all testified Welsh was fleeing the scene, and it was Masters who came up behind him and stabbed him with the fatal blows.[8] Only Masters testified to Welsh continuing his attack upon him as he crawled away.

Even assuming that is true, however, it does not restore Masters' right of self-defense. Of the two methods of restoration contained in KRS 503.060(3), only the second—the initial aggressor effectively withdraws—is potentially applicable. Taking the events in their totality, we have no doubt that three assailants armed with knives, guns, and tasers, holding people hostage, naked, and subjecting them to torture and threatening them with death meets the criteria for deadly physical force. KRS 503.010(1). If Welsh had successfully killed Masters, no one would doubt that homicide would be justified. As events transpired, however, Welsh did not kill Masters, and he remained in a trailer with three assailants; at least one of whom, Young, was armed with a revolver and the other, McVey, might have been thought to have been armed with a gun given the resemblance the taser had to one. The deadly scenario was not terminated merely by stabbing Masters nor did Masters' crawling into the hallway, if taken as withdrawal, effectively terminate the deadly scenario.

---

[8] The Medical Examiner testified Welsh suffered at least seven stab wounds including a fatal blow in the back.

11

In other words, Welsh was still entitled to defend himself with deadly force even after stabbing Masters until the deadly scenario was terminated either by the death, subjugation, or flight of all three assailants. It is not for this Court to second-guess Welsh's actions in how he defended himself. "In self-defense scenarios, so long as they are genuine, instinct is the law." *Dunkleberger v. Commonwealth*, 719 S.W.3d 17, 28 (Ky. 2025) (citing *Stanley v. Commonwealth*, 6 S.W. 155, 156 (Ky. 1887); *Tompkins v. Commonwealth*, 77 S.W. 712, 713 (Ky. 1903)). Welsh might have legitimately proceeded to attack McVey or Young in self-defense after stabbing Masters. He might just as well, assuming Masters' account is true, believed that Masters was the leader and killing him would effectively terminate the deadly scenario.[9]

Masters wants us to look at his struggle with Welsh as one-on-one combat divorced from the totality of the circumstances. That is not the proper test. Masters created the deadly situation, and the law does not allow him to claim a necessity to fight his way out once the deadliness turned upon himself. The trial court did not abuse its discretion in refusing to give self-defense or imperfect self-defense instructions.

## B. No Palpable Error in Rape Kit Testimony

Next, Masters argues the trial court palpably erred when it allowed Det. Middleton to testify the results of the rape kit performed on Kipenie turned up no semen, saliva, or any foreign DNA on her person. Masters argues such

_____

[9] The idiom "cut the head off the snake" well expresses this strategic thinking.

results should have been testified to by the nurse or lab technician who performed the tests. The Commonwealth concedes this testimony was hearsay but contends it was not palpable error as it had no effect on Masters' defense.

A palpable error is one of manifest injustice. RCr 10.26. It "is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Martin v. Commonwealth*, 207 S.W.3d 1, 5 (Ky. 2006). Masters and the Commonwealth agree the results of the rape kit and DNA testing should have been admitted pursuant to the testimony of the appropriate nurse and lab technician. Both parties cite *Peters v. Commonwealth*, 345 S.W.3d 838 (Ky. 2011) as authority and we affirm the correctness of their position. The Commonwealth should not have inquired about the results of the rape kit or DNA testing without calling the nurse and lab technician who performed the tests.

Nonetheless, we agree with the Commonwealth this error is not palpable. Importantly, the error here is not that substantively irrelevant or improper evidence was admitted. The results of the rape kit and DNA testing were relevant and admissible, at the very least in rebuttal of Masters' claim that his wife was raped. The error is in the manner of its admission. Masters argues his belief that his wife had been gang-raped was "his entire defense" and that his subsequent action to go back to the Hedden Flats trailer, which he believed he leased, and remove the men was justified by the rape. Masters argues the jury heard "the improper rape kit testimony—that Kipenie had conclusively not been raped—[which] was devasting" to his defense. The jury was compelled to

13

view "Dean, [Miller,] and Welsh—and their actions and credibility—in a different light." We are hard-pressed to accept this argument. The error in how this evidence was admitted is conceded, but that the jury heard three men accused of rape were most likely not guilty of rape can hardly be described as a manifest injustice. If the truth "threatens the integrity of the judicial process[,]" then the judicial process has lost the plot. *Martin*, 207 S.W.3d at 5.

Masters argues he was unable to cross-examine the nurse who performed the rape kit about potential destruction of evidence, such as Kipenie taking a bath. That is true, but that explanation as to the lack of DNA could have been established alternatively either by cross-examination of White, who remained with Kipenie while she was at McVey's house, or through Kipenie herself. Why the latter was not called to testify by Masters is ultimately unknown but perhaps a clue lies in his own testimony: that he was no longer sure Kipenie had told the truth about the rape. Det. Middleton was asked about the possibility of a shower or bath destroying evidence, and he did testify under cross-examination that he was not informed, despite two interviews with Kipenie, that a shower or bath had occurred prior to the rape kit being performed.

Suffice it to say, Masters' "entire defense" that he was justified in going to the trailer and removing the men from the premises has no correspondence with the reality of what he did. Masters did not remove the men from the premises. He woke them from their slumber, held them hostage on the premises at knife point with two other armed accomplices, forced them to strip

14

naked, then tortured them. Whatever right he may have had or believed he had to remove the men from the property, he far exceeded its scope. If the men had in fact raped his wife, he still would not be allowed by the law to do what he did. "Our law frowns on vigilante justice." *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 154 (1968) (Harlan, J., concurring), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984).

Secondly, even if Kipenie had not been raped, his defense hinged on his belief at the time of the events, not that his belief was accurate. *McClellan v. Commonwealth*, 715 S.W.2d 464, 469 (Ky. 1986) (reasonableness for extreme emotional disturbance defense "is to be determined from the viewpoint of a person in the defendant's situation under circumstances as defendant believed them to be."). Since Masters received the EED instruction which correctly explained the rule, we agree with the Commonwealth this testimony had no impact on Masters' defense and is not palpable error.

## C. Trial Court Abused its Discretion in Admitting Copy of Powers' Alleged Lease

Next, Masters argues the trial court erred when it allowed the Commonwealth to introduce a copy of the purported lease between Woods and Powers and Welsh for the Hedden Flats property. There are multiple issues with this argument, so we clarify first, this evidence is only relevant to the burglary conviction. That Masters had a right to be on the property would not absolve him of murder or unlawful imprisonment. Second, the arguments surrounding the admission of this evidence are two-fold. Masters argued before

the trial court the Commonwealth had violated its discovery order and that the copy of the lease did not conform to KRE 1003 and 1004. The Commonwealth argued before the trial court, and again before this Court, that it had no reason to believe the possessory interest in the property would be at issue until the first day of trial therefore, it had a justifiable excuse in failing to obtain a copy of the lease and turning it over to the defense until that very day. It further argues Powers was an appropriate party to authenticate the copy of the lease and therefore, there is no violation of the Rules of Evidence.

RCr 7.24(2) requires the Commonwealth to disclose material evidence to the defense within its possession. The Commonwealth also notes the trial court possesses the discretionary power to remedy discovery violations. *Stieritz v. Commonwealth*, 671 S.W.3d 353, 368 (Ky. 2023). We question that the Commonwealth was caught by surprise regarding Masters' defense. A plea of not guilty puts in contention all elements of a crime and it is the duty of the Commonwealth to prove every element beyond a reasonable doubt. *Taylor v. Commonwealth*, 671 S.W.3d 36, 43 (Ky. 2023). The Commonwealth had to have known it was required to demonstrate beyond a reasonable doubt that Masters had no right to be on the property to prove burglary in the first-degree. KRS 511.020(1). Moreover, Young had made a plea deal in exchange for his testimony against Masters and McVey, and the Commonwealth had to know he would testify he was informed they were going to Masters' trailer. Finally, there is a recorded conversation from the jail between Masters and Kipenie in which Kipenie stated, "Well, it's your place. You can go in whenever you want."

16

Common sense dictated at the very least that the Commonwealth anticipate this being an issue.[10]

Be that as it may, the Commonwealth could legitimately believe Powers' testimony would have sufficed to meet its burden. The trial court accepted the Commonwealth's explanation insofar as the discovery order is concerned and mere disagreement with the trial court's ruling is an insufficient basis upon which to predicate a conclusion that it abused its discretion. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003).

Next is the argument pertaining to the Rules of Evidence. "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required . . .[,]" KRE 1002, except a duplicate may be used unless there is "[a] genuine question as to the authenticity of the original" or "it would be unfair to admit the duplicate in lieu of the original." KRE 1003. KRE 1004 also conditions the use of a duplicate upon the original being lost, destroyed, unobtainable by judicial process, or when the original is in the possession of the party against whom it is offered and said party refuses to produce it. The trial court's decision is reviewed for an abuse of discretion. *Kerr v. Commonwealth*, 400 S.W.3d 250, 261 (Ky. 2013).

There is surprisingly little case law on these rules. KRE 1004 has only been cited in three published opinions none of which are particularly edifying

---

[10] Masters heavily relies upon this statement for his argument the Commonwealth violated the discovery order. While this statement would have justified further investigation into the tenancy of the trailer, we do not think it legally compelled the Commonwealth to obtain and disclose a copy of Powers' lease to Masters prior to trial.

or applicable. KRE 1003 has only been cited four times in published opinions. Our last comment upon it, thirteen years ago, came in *Savage v. Three Rivers Med. Ctr.*, 390 S.W.3d 104, 114-15 (Ky. 2012). That case involved copies of x-rays obtained in 1993 and admitted at a trial in 2009. *Id.* at 109-10. The Court noted there was no dispute about the authenticity of the original x-rays but there remained "the question of whether the x-rays produced by Sophia are, as she claims, actual duplicates of the x-rays created by ARH [Appalachian Regional Hospital] in 1993." *Id.* at 115. The Court then held testimony by the appellant, pursuant to KRE 901, sufficed to establish authenticity of the copy. *Id.* Because the appellant testified to how she obtained copies of the x-rays and when, where she kept them during the intervening years, and then gave the copies to her attorneys, that "was sufficient to support a finding that the matter in question . . . is what its proponent claims; moreover, this testimony at the same time would also satisfy any chain of custody concerns." *Id.*

The facts of our case are starkly different. Due to the late admission of the copy of the lease, a cloud was cast over the authenticity of the original. Powers gave hearsay testimony that Woods informed her over telephone he had lost the original when moving offices. Then there is the fact the copy was retained by Welsh, not Powers, and was allegedly found in Welsh's family's possession. Powers cannot at all account for the custody of the document for the intervening three years between the signing of the lease and trial, and her testimony is not comparable to that found in *Savage*. Finally, there is the

18

discrepancy in the dates on the copy of the lease and the lack of the landlord's signature.

It was long the rule in the common law that a signatory to a lease is "clearly competent, and ought to have been sworn, not to give testimony to the jury but to the court, to satisfy the court that the best evidence was not in his power, and thereby lays a foundation for evidence of a secondary grade[.]" *Hamit v. Lawrence*, 9 Ky. 366, 366 (1820).[11] On the other hand, the common law also held that where a document is purported to be lost, then "the last person who had possession . . . should have been introduced to show that it was lost, or his absence satisfactorily explained." *Taulbee v. Drake*, 198 S.W.2d 50, 51 (Ky. 1946). *Hamit*, indeed, conforms to this rule as well. *Hamit*, 9 Ky. at 366-67; *see also Nutall's Adm'r v. Brannin's Ex'rs*, 68 Ky. 11, 18-19 (1869); *Home Ins. Co. v. Westerfield*, 99 S.W.2d 464, 466 (Ky. 1936). The common law also required a diligent search for the original be conducted prior to allowing admission of a copy. *Standard Accident Ins. Co. of Detroit v. Rose*, 234 S.W.3d 728, 731 (Ky. 1950). Once again, both *Hamit* and *Taulbee* conform to this rule. *Hamit*, 9 Ky. at 366-67 (testimony of not merely the last known custodian but of all known custodians of original document was presented and this was deemed sufficient); *Taulbee*, 198 S.W.2d at 50 (appellant's hearsay testimony that last known custodian informed him original letter was lost was insufficient to show diligent search or that letter was in fact lost absent showing of unavailability of last known custodian).

---

[11] This is the most recent published decision in Kentucky stating the rule.

As for KRE 901, we accept that a signatory to a lease may testify to authenticate a copy of said lease. *See e.g., Wheelhouse Marina Real Estate, L.L.C. v. Bommarito*, 284 S.W.3d 761, 768 (Mo. Ct. App. 2009). Although Powers was never the custodian of the copy, she did testify that she recognized it as the one given on the day she and Welsh signed the lease, and that she saw Welsh put the copy in the glovebox of his car. Under KRE 901, we conclude the trial court properly allowed Powers to authenticate the copy. *See Thomas v. Commonwealth*, 153 S.W.3d 772, 778-82 (Ky. 2004). Authentication of a copy, however, is a secondary question to demonstrating the circumstances allow for a copy to be admitted. The Commonwealth does not make any argument against *Taulbee*, its application to the facts of this case, or that it did not have to conduct a diligent search for the original prior to introducing the copy of the lease for admission into evidence. There is, however, one obvious objection: *Hamit*, *Taulbee*, and *Rose* predate the Rules of Evidence and are no longer applicable.

Professor Lawson noted our post-Rules case law has never addressed this issue, and this case affords an opportunity to so do. In making that observation, Prof. Lawson continued,

> KRE 1004 is silent with respect to the kind of showing needed for reliance on this excuse [i.e., the original is lost or destroyed] but drafters of the provision made a statement expressing a belief that such matters should be left with the trial court:
>
>> Prior law contained specific requirements concerning the type of search necessary to qualify loss of the original as a satisfactory explanation. The omission of such requirements from this provision reflects an

20

> intention to leave this issue to the discretion of the
> trial judge.

Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 7.25[2][b] (2022 ed.). That such matters should be left in the discretion of the trial court is nothing more than a truism which does not alter the common law. *See Sherman v. Sherman,* 160 S.W.2d 637, 638-39 (Ky. 1942). The question then, in light of the Commentary, is whether KRE 1002-1004 incorporated the common law requirements found in *Taulbee* and *Rose,* or did it intend to eliminate them?

As Prof. Lawson has noted elsewhere, in 1992 we declared we "had 'neither adopted nor approved the Commentary.'" Robert G. Lawson, *Interpretation of the Kentucky Rules of Evidence-What Happened to the Common Law?*, 87 Ky. L.J. 517, 558 (1999) (quoting Order of Supreme Court of Kentucky, May 12, 1992)). Consequently, despite "more than one hundred decisions involving the Kentucky Rules of Evidence[,]" between their passage in 1992 and Prof. Lawson's article in 1999, the commentary "has not played as much of a role in the interpretation of the Rules as [the] drafters had anticipated." *Id.* at 557-58. Without going into scholarly detail, Westlaw shows only thirty-three published cases from this Court since 1999 referring to the "commentary" out of a total of 351 published decisions involving the "rules of evidence." It would, therefore, appear that Prof. Lawson's observation in 1999 remains correct: the Commentary does not play much of a role in our jurisprudence. As Justice Scalia wisely noted of the similar commentary for the

21

Federal Rules of Evidence, "[l]ike a judicial opinion and like a statute, the promulgated Rule says what it says, regardless of the intent of its drafters . . . . [they] cannot, by some power inherent in the draftsmen, change the meaning that the Rules would otherwise bear." *Tome v. United States*, 513 U.S. 150, 168 (1995) (Scalia, J., concurring in part).

In contrast, "the preexisting common law has been more heavily used to interpret the Rules than all other nontextual sources of interpretation combined." Lawson, *Interpretation of the Kentucky Rules of Evidence*, 87 Ky. L.J. at 560. In interpreting the Federal Rules of Evidence, the Supreme Court of the United States has noted, "'no common law of evidence remains . . . In reality, of course, the body of common law knowledge continues to exist, though in the somewhat altered form of a source of guidance in the exercise of delegated powers.'" *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993) (quoting *United States v. Abel*, 469 U.S. 45, 51-52 (1984)).

Kentucky's Rules of Evidence were not created in a vacuum but taken mainly from the common law while winnowing down much of the dross that had accumulated over centuries. For the majority of the Rules, they represent a synthesis of the common law rather than the creation *ex nihilo* of a new rule. "The Kentucky Rules . . . can properly be viewed as a codification of preexisting common law principles. They mostly reaffirm preexisting doctrine and were not in any sense crafted from 'whole cloth'; the supreme court has described them as a codification." Lawson, *Interpretation of the Kentucky Rules of Evidence*, 87 Ky. L.J. at 567 (citing *Harrison v. Commonwealth*, 858 S.W.2d 172, 175 (Ky.

22

1993)). Accordingly, in the event the text of the Rules does not provide a clear answer to an issue, the pre-Rules common law serves as the best evidence of what the Rules were intended to mean, either consistently with the common law or to demonstrate where the Rules departed from it.

That conclusion helps us now. The Commentary views silence in the Rules of Evidence as rejection of the common law. Instead, both the Supreme Court of the United States and this Court have viewed silence in the Rules as an invitation to investigate the common law for resolution, within the framework of the Rules of Evidence. *See Abel*, 469 U.S. at 50-51 (Federal Rules of Evidence's silence on allowing impeachment evidence for bias was answered by the common law within framework of FRE 401); *United States v. Mezzanatto*, 513 U.S. 196, 200-03 (1995) (FRE 410's silence as to whether plea-statements rule could be waived by defendant resolved by common law and by broader principles of constitutional and statutory interpretation, as well as Federal Rules of Criminal and Civil Procedure); *Stringer v. Commonwealth*, 956 S.W.2d 883, 891-92 (Ky. 1997) (holding "[o]ur failure to adopt proposed KRE 704 simply left the 'ultimate issue' unaddressed in the Kentucky Rules of Evidence and, therefore, subject to common law interpretation by proper application of the rules pertaining to relevancy, KRE 401, and expert testimony, KRE 702."); *Commonwealth v. Howlett*, 328 S.W.3d 191, 192-93 (Ky. 2010) (silence of KRE 201 on particular question regarding judicial notice of facts was resolved by common law).

We are convinced the requirement that the last known custodian of an original document purported to be lost should testify to the circumstances of that loss, and that a diligent search be performed for the original before a duplicate be admitted, both of which can be traced to the early decades of the law in the Commonwealth, are rules of too lengthy and consistent application to have been jettisoned by the Rules of Evidence through mere silence. *See Abel*, 469 U.S. at 50 (given "state of unanimity [in pre-existing law] confronting the drafters of the Federal Rules of Evidence, we think it unlikely that they intended to scuttle entirely the evidentiary availability of cross-examination for bias."); *Mezzanatto*, 513 U.S. at 203-04 (FRE 410's silence not "an implicit rejection of waivability."); *Howlett*, 328 S.W.3d at 193 (KRE 201's silence "no reason to depart from our previous case law on the subject."); *cf. Stringer*, 956 S.W.2d at 891 (holding the common law rule was not the "common sense view" and "the inherent inconsistency in our decisions" applying the common law justified reading KRE 401 and 702 as departing from it.).

*Taulbee*'s rule that the last known custodian of the original must testify to the circumstances as to how the original was lost or destroyed, or else the party offering the duplicate must demonstrate the last custodian's unavailability as a witness, is a clear and general rule that provides guidance to bench and bar as to how to meet the prerequisites of KRE 1004. It is unambiguous and does not defy common sense. Nor do we think the use of hearsay testimony to establish an original document's loss or destruction is

24

reconcilable with the thrust of the Kentucky Rules of Evidence that generally

condemns hearsay testimony with exceptions. KRE 802, 803, 804.[12]

Rose's requirement that a diligent search be conducted for the original is

also a natural conclusion that flows from and comports with KRE 1002, 1003,

and 1004. KRE 1002's requirement of an original document when possible is

reduced to superfluity if all that is necessary to get around it is for a party to

assert the original is lost or destroyed without offering any proof by a person

with direct knowledge of the circumstances. KRE 1003's and 1004's

conditioning the circumstances of when a duplicate is and is not admissible do

not reflect a general intent to throw open the doors to duplicates under any

circumstance a trial judge might deem sufficient. It is true the Best Evidence

Rule is preferential and not exclusionary. Lawson, *The Kentucky Evidence Law

Handbook* § 7.25[1] (2022 ed.). But it is also true that it is not *carte blanche.*

In any given case, what constitutes a "diligent search" is of course

subject to the circumstances of the case and the discretion of the trial judge;

that is what the common law held and what the Rules of Evidence perpetuated.

This requirement, however, is not so ambiguous that its application proved

unwieldly or inconsistent prior to adoption of the Rules of Evidence, nor does

such a requirement defy common sense. *Cf. Stringer*, 956 S.W.2d at 891. That

a duplicate was admitted in this case merely upon the hearsay assertion that

the original was lost without any demonstration of the circumstances by the

---

[12] None of the exceptions in KRE 803 or 804 cover Powers' testimony regarding the original lease's loss, which was offered to prove the truth of the matter asserted— that the original lease was in fact lost.

25

last known custodian or that he was unavailable to testify; and with a search that consisted of no more than an interested witness making phone calls to the last custodian, contrasted to the subpoena power of the trial court to call the landlord as a witness so that he may testify as to what he did to search for the original, as well as the Commonwealth's investigative abilities, is too deficient.

Consequently, given the cloud cast over the authenticity of the original under the circumstances of this case; the failure to demonstrate a diligent search for the original; and the use of hearsay testimony of an interested witness regarding the loss of the original as opposed to calling the last known custodian without any demonstration of his unavailability as a witness; we conclude the trial court's decision to admit the copy of the lease is not supported by sound legal principles and is an abuse of its discretion.

We do not find this error to be harmless. The inquiry in that test "is not simply 'whether there was enough evidence to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'" *Winstead v. Commonwealth*, 283 S.W.3d 678, 689 (Ky. 2009) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). Though Powers' testimony could still suffice to establish her tenancy, Masters' own testimony regarding his tenancy contradicted it. The issue becomes one of credibility and, as Blackstone once observed, "the witness who affirms, and the accused who denies, make an equal balance[.]" V Tucker's Blackstone 357 (St. George Tucker ed., The Lawbook Exchange, Ltd. 2011) (1803). Masters was a lessee of

26

Woods for the trailer he lived in with his family; he testified to entering an oral agreement with Woods to lease the Hedden Flats property; and receipts showed thousands of dollars in expenditures which Masters testified was for said property. His account is not implausible and is good evidence which a reasonable juror could have believed in absence of the improperly admitted copy of the lease. We conclude the improperly admitted copy of the lease did have a substantial impact with the jury on this discrete issue. The conviction for first-degree burglary is reversed.

### D. No Error in Trial Court's Hearing on the Motion to Withdraw

Finally, Masters argues he was not given an adequate hearing on his appointed counsel's motion to withdraw according to *Deno v. Commonwealth*, 177 S.W.3d 753 (Ky. 2005). Masters is not arguing the trial court's decision was an abuse of discretion in and of itself, but that it failed to follow a procedural requirement in making that determination which necessarily taints the decision. To refresh, it was Masters' counsel who initially brought the motion to withdraw because of Masters' refusal to speak with him or co-counsel. Only then did Masters argue to the trial court that he and counsel had only spoken twice for a total of one hour in the previous ten months; they had not worked on his defense or gone over discovery; and, generally, that counsel had not investigated the case according to Masters' preference and direction.

> An indigent defendant is not entitled to the appointment of a particular attorney, and a defendant who has been appointed counsel is not entitled to have that counsel substituted unless adequate reasons are given. When a defendant requests substitution of counsel during trial, "the defendant must show

27

good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict." Good cause has been described as: (1) a "complete breakdown of communications between counsel and defendant;" (2) a "conflict of interest;" and (3) that the "legitimate interests of the defendant are being prejudiced." Whether good cause exists for substitute counsel to be appointed is within the sound discretion of the trial court.

*Id.* at 759 (internal citations omitted). "This is a high bar and there must be good cause for removal." *Henderson v. Commonwealth*, 563 S.W.3d 651, 669 (Ky. 2018). To that end, we have held that even filing a bar complaint or a lawsuit against counsel does not automatically require granting a motion to withdraw or substitute counsel. *Grady v. Commonwealth*, 325 S.W.3d 333, 344-45 (Ky. 2010). Contrary to Masters' assertion, we have never read *Deno* as requiring a specific procedure on motions to withdraw or substitute counsel.[13]

The right to be protected in a motion to withdraw or substitute counsel is the Sixth Amendment's and Section 11 of Kentucky's constitution's guarantee of the right to counsel. *Hargrove v. Commonwealth*, 362 S.W.2d 37, 39-40 (Ky. 1962). Accordingly, a complete breakdown in communication between counsel and client must be tantamount to the complete denial of counsel. "[D]isagreements between appellant and his counsel as to trial tactics" do not

---

[13] Masters can cite to no published authority so holding therefore cites an unpublished Court of Appeals opinion, *Garren v. Commonwealth*, No. 2019-CA-000027-MR, 2019 WL 5681185, at *3 (Ky. App. Nov. 1, 2019), which held *Deno* requires a specific procedure be followed on motions for withdrawal. Though we are loath to cite unpublished decisions, we cannot help but note we have rejected such an argument already: "Our finding that the trial court followed the 'correct procedure' in *Deno* does not mandate the identical procedure for the instant case." *Schell v. Commonwealth*, No. 2006-SC-000662-MR, 2008 WL 203036, at *3 (Ky. Jan. 24, 2008).

28

generally reflect a "breakdown [in] communications." *Baker v. Commonwealth,* 574 S.W.2d 325, 327 (Ky. App. 1978). "If a client declines to participate in his defense, then an attorney may permissibly guide the defense pursuant to the strategy she believes to be in the defendant's best interest." *McCoy v. Louisiana,* 584 U.S. 414, 424 (2018).

Based on Masters' allegations described above, we find this case similar to *Stinnett v. Commonwealth,* 364 S.W.3d 70 (Ky. 2011). In that case,

> [d]uring the almost three years it took to bring the case to trial, Appellant filed numerous motions and wrote frequent letters to the trial court seeking to have [his counsel] Yustas and Hieneman replaced. Appellant's principal complaint was that his attorneys did not maintain contact with him and, correspondingly, failed to discuss his defense with him. He also claimed that they had failed to investigate his case and interview witnesses. Based upon his dissatisfaction, Appellant twice filed complaints against his attorneys with the Kentucky Bar Association.

*Id.* at 81. With the exception of the bar complaints, Masters' allegations are identical to those in *Stinnett.* In that case, we held, "Appellant has proffered little more than generalized dissatisfaction with his appointed counsel. He fails to allege any of the well-established bases to obtain such relief." *Id.* Masters, similarly, has demonstrated nothing more than generalized grievances with his counsel.

Additionally, we note the hearing occurred approximately seven months before trial[14] and therefore, there was plenty of opportunity for Masters to help remedy his situation by speaking with counsel and aiding his defense. For the same reason we rejected that filing a bar complaint automatically requires

---

[14] Trial occurred in April 2024.

substituting counsel—because "[t]o so hold would allow a dissatisfied client to manufacture 'good cause' by simply filing a bar complaint[,]" *id.*—we reject that a defendant can simply refuse to speak with his counsel and thereby demonstrate a complete breakdown in communication. The trial court below heard counsel's own motion to withdraw which was based on Masters' refusal to speak with him and co-counsel. The trial court expressed its belief that Masters had made his own choice in refusing to aid his own defense and was seeking to create an issue for appeal. The trial court then allowed Masters to address what he believed were his counsel's deficiencies in representation. Afterward, the trial court remained unconvinced Masters had shown good cause to substitute counsel. There is nothing in the record to demonstrate the trial court's conclusion is an abuse of discretion or clearly erroneous.

## III.  Conclusion

For the aforementioned reasons, we affirm Masters' convictions for murder and four counts of unlawful imprisonment. We reverse his conviction for first-degree burglary. Because the sentence of imprisonment for the latter charge—ten years—was run concurrently with the sentence of imprisonment for murder, Masters' sentence of imprisonment for a total of thirty-five years is unaffected by our reversal. We remand to Knox Circuit Court for amendment of the judgment and sentence, and any further proceedings consistent with this opinion.

All sitting. Lambert, C.J.; and Goodwine, J., concur. Thompson, J., concurs in result only. Nickell, J., concurs in part and dissents in part by separate opinion which Bisig and Keller, JJ., join.

NICKELL, J., CONCURRING IN PART, DISSENTING IN PART:  I concur with much of the majority's well-reasoned opinion, but part ways relative to its analysis of the interplay between the best evidence rule, as articulated in KRE 1001-1008, and prior common law decisions.  Because I cannot conclude the trial court abused its discretion by admitting secondary evidence of the lease, I would affirm the judgment of conviction and sentence in its entirety.

Pertinent to the present appeal, KRE 1004(1) permits the introduction of secondary evidence "of the contents of a writing, recording, or photograph" when "[a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith[.]"  The plain language of KRE 1004 does not contain any independent requirement of a diligent search or that the last known custodian must testify in order to prove the loss or destruction of an original document.

Following the enactment of the Rules of Evidence, I perceive such common law principles to merely serve as "an avenue by which the larger issue of the document's destruction" or loss may be proven as a matter of circumstantial evidence.  *United States v. McGaughey*, 977 F.2d 1067, 1071 (7th Cir. 1992).  Professor McCormick further explained:

> Loss or destruction may sometimes be provable by direct evidence, such as testimony from a witness who destroyed the document. But more often the only available evidence will be circumstantial, usually taking the form of testimony that an appropriate search for

31

the document has been made without locating it. In such cases, the adequacy of the showing will be largely dependent upon the thoroughness and appropriateness of the search. It has been held that when a writing is last known to have been in a particular place or in the hands of a particular person, then that place must be searched or the person produced. **It is believed, however, that these statements are best considered as general guides or cautions, rather than strict and unvarying rules.** Virtually all jurisdictions view the trial judge as possessing some degree of discretion in determining the preliminary question as to whether loss or destruction makes it infeasible to produce the original document.

2 *McCormick On Evid.* § 237 (9th ed. 2025) (emphasis added).

The standard for determining such preliminary questions of fact under KRE 1004 is set forth in KRE 1008 which states as follows:

When the admissibility of other evidence of contents of writings, recordings, or photographs under these rules depends upon the fulfillment of a condition of fact, the question whether the condition has been fulfilled is ordinarily for the court to determine in accordance with the provisions of KRE 104. However, when an issue is raised:

(a) Whether the asserted writing ever existed;

(b) Whether another writing, recording, or photograph produced at the trial is the original;

(c) Whether other evidence of contents correctly reflects the contents,

the issue is for the trier of fact to determine as in the case of other issues of fact.

Except for those issues specifically enumerated in KRE 1008(a)-(c), "[m]ost questions of preliminary fact raised by the provisions of Article X are for the judge to decide under Rule 104(a)." Victor J. Gold, 31 *Fed. Prac. & Proc. Evid.* § 8064 (2d ed. 2025) (explaining federal counterpart to KRE 1008). Similarly, Professor Lawson's treatise states:

32

(1) Although KRE 1004 says nothing about burden of proof, it is likely that the party relying on one of its excuses would have to bear the burden of proving its requirements to the trial court's satisfaction. (2) Factual findings needed for use of KRE 1004 would be governed by KRE 104(a), meaning that findings would have to satisfy the preponderance of evidence standard of that provision.

Robert G. Lawson, 1 *Kentucky Evidence Law Handbook* § 7.25[5] (2024).

KRE 104(a) states:

Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b) of this rule. **In making its determination it is not bound by the rules of evidence except those with respect to privileges.**

(Emphasis added). Thus, under KRE 104(a), the trial court may rely upon inadmissible evidence, such as hearsay, to resolve preliminary questions relative to the admissibility of evidence under KRE 1004. *See Gerlaugh v. Commonwealth*, 156 S.W.3d 747, 753 (Ky. 2005) (citing *Bourjaily v. United States*, 483 U.S. 171, 181 (1987)); *see also State v. Hermsdorf*, 605 A.2d 1045, 1048 (N.H. 1992) (concluding "hearsay was properly considered by the trial court in determining the admissibility of the secondary evidence" under Rules 1008 and 104(a)).

Based on the foregoing authority, I would conclude the trial court properly considered hearsay evidence in determining the preliminary issue concerning the loss of the original lease. Powers also directly testified regarding her own efforts to obtain the original lease from the landlord on two

33

occasions. Thus, the trial court's ruling was not based entirely upon hearsay. *See Gerlaugh*, 156 S.W.3d at 754.

Certainly, "it is true" that the Commonwealth provided "little information concerning the extent of [the] search" for the original lease and could have proceeded in a different manner. *Crawford v. Tribeca Lending Corp.*, 815 F.3d 121, 127 (2nd Cir. 2016). However, I cannot conclude the trial court abused its discretion by admitting the copy of the lease. *Id.* Our precedents consistently extend substantial "deference to the trial court's factual findings and ruling in such matters as evidentiary questions . . . because the trial court is in the best position to evaluate the evidence." *Bailey v. Commonwealth*, 194 S.W.3d 296, 304 (Ky. 2006) (quoting *Miller v. Eldridge*, 146 S.W.3d 909, 917 (Ky. 2004)). While I may have viewed the evidence and decided the question differently in the first instance, I do not perceive the trial court's ruling to have been "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). Therefore, I respectfully concur in part, dissent in part, and would affirm the judgment of conviction and sentence in its entirety.

Bisig and Keller, JJ., join.

COUNSEL FOR APPELLANT:

Shannon Dupree
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Courtney J. Hightower
Assistant Attorney General